**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARROW MOLDED PLASTICS, INC., Respondent.**

No. 79–1550.

United States Court of Appeals, Sixth Circuit.

July 13, 1981.

Before WEICK, KEITH and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

The National Labor Relations Board (the Board) seeks enforcement of its order directing Arrow Molded Plastics, Inc. (Arrow) to bargain in good faith with Local 146, United Food and Commercial Workers International Union, AFL–CIO (the Union), even though the Union failed to obtain a majority vote in its representation election. The Board also ordered Arrow to cease and desist from continuing certain unfair labor practices. We hold that Arrow's unfair labor practices were not so pervasive as to undermine the Union's previous card majority, impede the election process and to interfere with the employees' freedom to select a bargaining representative. Therefore, enforcement of the Board's cease and desist order is granted and enforcement of its bargaining order is denied.

I.

Arrow, an Ohio corporation, manufactures and sells injection-molded plastic products. In August 1977, the Union conducted an organizational campaign at Arrow's Napoleon, Ohio plant. A clear majority of Arrow's production and maintenance employees signed authorization cards. Consequently, Arrow petitioned for a representation election. The Board scheduled the election for October 21, 1977.

In September 1977, William Brock, an Arrow vice president, hired James Cavanaugh, a personnel consultant. Cavanaugh devised a plan to hold several pre-election meetings with Arrow's employees. The purpose of these meetings was to solicit employee grievances, in recognition that "there was a union knocking at the door." On several occasions, the employees of all three shifts attended the meetings.

At the first meeting, Cavanaugh informed the employees that he wanted to confer with them individually. During these individual conferences, he elicited

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., Joseph Schwachter, Bernard Levine, Director, Region 8, N. L. R. B., Cleveland, Ohio, for petitioner.

Roger Benko, Thornburg, McGill, Deahl, Harman, Carey & Murray, Elkhart, Ind., Lawrence C. DiNardo, for respondent.

their answers to a single question: "If tomorrow morning when you awakened you were the president of this company, what would you do?"

Cavanaugh and Brock conducted the remaining group meetings. Cavanaugh told the employees that he had prepared a report summarizing the information gathered from the individual interviews. In view of the forthcoming election, Cavanaugh stated that the contents of the report could not be revealed because "no promises, direct or indirect" could be made. Additionally, Cavanaugh recommended the installation of a "hot box" so that the employees' suggestions could be "answered" if possible. Furthermore, in response to employee inquiries of wage increases, Cavanaugh stated that Arrow's policy was to pay equal or greater wages than those paid "in our area for similar work by similar companies." Cavanaugh added that if the Union lost the election, it would take about ten days to get a raise, but if the Union won it could take six months to a year to obtain wage increases.

During these meetings, Brock also made several representations to the employees. First, an employee asked whether Arrow would meet with shift representatives if the Union lost the election. Brock replied that a reinstitution of the shift representative system was an alternative to union representation. Second, an employee questioned Arrow's disciplinary policies for absenteeism. An employee (Pearl Pinney) had been reprimanded for being absent when in fact she was on leave. Brock responded that Pinney's reprimand probably should not have been written and he would "look into it." Third, an employee queried the condition of the lunchroom. Brock stated that Arrow wanted to redecorate the lunchroom but that the pending election prevented the redecoration. Nevertheless, prior to the election, renovating materials including metal stripping, ceiling tile, paint and new carpeting were displayed in the lunchroom. Shortly after the election, the employees' lunchroom was completely redecorated and reequipped with new appliances. Fourth, Brock and Cavanaugh responded favorably to employee requests for tuition reimbursement for nursing school and "basket weaving" courses even though the company handbook permitted reimbursement only for "Company recommended education and special instruction courses."

On or about October 13, one of the three shift inspectors quit. Arrow's express policy for filling such vacancies is that "seniority shall control provided qualifications are equal." An employee with superior qualifications and seniority applied for the position. Arrow's superintendent informed the applicant that "if we didn't have this union business, we wouldn't have all of these problems." Until the vacancy was filled, the other two shift inspectors had to work 12-hour days. After the Union lost the election, the applicant was promoted to fill the vacancy.

On October 21, 1977, the Board conducted the representation election. The Union lost the election by nine votes. No ballots were challenged by either party.

On December 21, 1978, an Administrative Law Judge (ALJ) found that the aforementioned conduct as well as Arrow's maintenance of an unlawfully broad, no-solicitation, no-distribution rule [1] constituted unfair labor practices in violation of section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 151, *et seq.* Because Arrow's pre-election misconduct interfered with its employees' freedom of choice, the ALJ ordered Arrow to bargain collectively with the Union. The Board affirmed.[2]

---

1. The employee handbook described the following as a disciplinary offense:

 Distributing literature, written or printed matter of any description on company premises without the specific approval of management.

It is undisputed that this rule was not enforced during the election campaign.

2. However, one Board member dissented from the determination that Brock's promise to "look into" an allegedly improper reprimand was an unfair labor practice.

## II.

Section 7 of the Act guarantees employees the right to freely select union representation. Section 8(a)(1) of the Act secures employee organizational rights by making it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights.

 Arrow interfered with the employees' exercise of their Section 7 rights by improperly soliciting grievances before the election, by making certain promises and granting benefits, and by withholding benefits and threatening employees.[3] Additionally, Arrow maintained an overly broad no-distribution rule during the organizational campaign.

### a. Grievance Solicitation.

 Grievance solicitation during the pre-election period is not a *per se* violation of Section 8(a)(1) of the Act. It is an unfair labor practice, however, to solicit employee grievances where the solicitation is accompanied by the employer's express or implied suggestion that the grievance will be resolved or acted upon only if the employees reject union representation. *NLRB v. Delight Bakery, Inc.*, 353 F.2d 344 (6th Cir. 1965); *Reliance Electric Co.*, 191 NLRB No. 1 (1971), enf'd. 457 F.2d 503 (6th Cir. 1972). In this case, Arrow initiated unprecedented meetings with its employees to solicit grievances. Arrow went beyond mere solicitation: it undertook affirmative steps to resolve those grievances at times and under circumstances which are highly questionable. In fact, this kind of interference in the election process is impermissible. *NLRB v. Rich's of Plymouth*, 578 F.2d 880 (1st Cir. 1978).

### b. Granting and Withholding Benefits.

We agree with the Board that Arrow's conduct in granting and withholding benefits in order to discourage union activity is proscribed by Section 8(a)(1) of the Act. "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964).

The record is replete with instances of promises made with the intent to reverse the Union's previous card majority. Cavanaugh's promise of wage increases commensurate with Arrow's competitors was expressly contingent upon the Union's defeat at the representation election. Cavanaugh suggested the installation of a "hot box" so that employee suggestions could be "answered." Brock offered the shift representation system as a substitute for union representation. Brock promised to "look into" reprimands, redecorate and reequip the lunchroom, and reimburse employees for non-job-related education. Also, Arrow withheld an employee's promotion because of the "problem" caused by "this union business." Despite Arrow's disclaimer, promises were made and benefits were granted and withheld for no other reason than to forestall unionization of the Napoleon plant and to interfere in the election process.

### c. No-Distribution Rule.

 It is well settled that Section 7 of the Act guarantees employees the right to distribute union literature on their employer's premises. *Republic Aviation Corp. v.*

---

**3.** Though the employer's free speech right to communicate its views to its employees cannot be infringed upon by a union or by the Board, such right to free speech is not absolute. Threats of reprisal or force or promise of benefit do not constitute protected speech within the meaning of section 8(c) of the Act. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). "Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in section 7 and protected by section 8(a)(1) and the proviso to section 8(c)." *Id.* Consequently, Arrow's granting and withholding benefits during its grievance solicitation cannot fall within the purview of section 8(c) protected speech.

*NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). A company rule which precludes solicitation and distribution of union literature at any time, including during nonworking hours in nonworking areas, is presumptively unreasonable. *Id.* at 804–805, 65 S.Ct. at 988–989; *Eastex, Inc. v. NLRB*, 437 U.S. 556, 570–571, 98 S.Ct. 2505, 2514–2515, 57 L.Ed.2d 428 (1978). Special circumstances must be demonstrated to justify such a rule. In this case, no such circumstances were present. Therefore, Arrow violated Section 8(a)(1) of the Act by its maintenance of an unlawfully broad no-distribution rule during the organizational campaign.

### III.

Arrow vigorously objects to the Board's imposition of a bargaining order. The Board attempted to justify the bargaining order on the grounds that Arrow's unfair labor practices were so pervasive as to erode the Union's previous card majority and to render the conventional remedy of a rerun election ineffective. We disagree.

The issuance of a bargaining order is a severe remedy which is properly utilized in only two situations: either "in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices . . . [or] in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–614, 89 S.Ct. 1918, 1939–1940, 23 L.Ed.2d 547 (1969). However, bargaining orders will not be enforced to remedy minor or less extensive unfair labor practices. *Id.* at 615, 89 S.Ct. at 1940. The reason for this result is that this latter category of unfair labor practices only marginally and temporarily impact on the election machinery. In that event, a fair rerun election is the preferred method of securing the employees' Section 7 rights.

It is equally inappropriate to enforce bargaining orders where the Board's rationale for the order was conclusory, *NLRB v. Essex Wire Corp.*, 496 F.2d 862 (6th Cir. 1973); *NLRB v. Eastside Shopper, Inc.*, 498 F.2d 1334 (6th Cir. 1974);[4] or where the "classic tactics of discharge and widespread discrimination against the harassment of union sympathizers were not present . . . [and] (t)he unfair labor practices which occurred were of the kind whose effect would quickly dissipate," *Donn Products, Inc. v. NLRB*, 613 F.2d 162, 166 (6th Cir.) *cert. denied* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); or where a single unfair labor practice does not sufficiently undermine the election process. *A to Z Portion Meats, Inc. v. NLRB*, 643 F.2d 390 (6th Cir. 1981).

Applying these principles we are compelled to hold that the Board's decision to issue a bargaining order was not supported by substantial evidence on the record as a whole. We cannot minimize or ignore Arrow's improper grievance solicitation before the election, or persistent promises, grants and withholding of benefits, or unlawful no-distribution rule. Nevertheless, Arrow's misconduct fell far short of actual or threatened antiunion plant closures, disciplinary discharges, and employee surveillance which characterizes the cases in which this Court has enforced bargaining orders. Additionally, the passage of time since the first election militates in favor of a rerun election. Under these circumstances, a bargaining order is not warranted.

Accordingly, the application of the Board for enforcement of its order is GRANTED in part and DENIED in part.

---

4. *Accord, NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980); *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503 (7th Cir. 1980); *NLRB v. Peninsula Ass'n. for Retarded*, 627 F.2d 202 (9th Cir. 1980).