### The DAVIS COMPANY,
Plaintiff-Appellee,

v.

### UNITED FURNITURE WORKERS OF AMERICA, AFL–CIO; Local 282, United Furniture Workers of America, AFL–CIO; and Willie Rudd, Defendants-Appellants.

No. 80–1477.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 30, 1981.

Decided March 31, 1982.

Rehearing and Rehearing En Banc
Denied May 13, 1982.

B. J. Wade, Hicks, Gillespie, Mames & Agee, Memphis, Tenn., for defendants-appellants.

Ross B. Clark, II, Laughlin, Halle, Regan, Clark & Gibson, Stephen Goodwin, Memphis, Tenn., for plaintiff-appellee.

Before EDWARDS, Chief Judge, and WEICK * and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

In this action, brought pursuant to § 301 of the Labor Management Relations Act of 1947 as amended (the Act), 29 U.S.C. § 185 (1976), an employer sought damages from a union and a union official for breach of a collective bargaining agreement. The employer also claimed damages for defamation, asserting pendent state jurisdiction. Following a bench trial, the district court entered judgment for the plaintiff on both claims.

## I.

The plaintiff, The Davis Company (the employer), a Tennessee corporation, entered into a three-year collective bargaining agreement with the United Furniture Workers of America, AFL–CIO, Local No. 282 (the union) on September 6, 1977. The agreement covered employees at the Memphis facilities of Davis. The defendant Willie Rudd signed the agreement on behalf of Local 282. He was president of Local 282 and a representative of the international union at all times pertinent to this case. Pursuant to the collective bargaining agreement (the agreement), on June 27, 1978 a group of Davis employees filed a grievance in which they claimed they had not been fully paid for overtime work. Article VI of the agreement provided for overtime as follows:

---

* Circuit Judge Weick retired from regular active service under the provisions of 28 U.S.C. § 371(b) on December 31, 1981, and became a Senior Circuit Judge.

An employee will be paid 1½ times over eight (8) hours in any day worked, provided (a) they are scheduled to work five (5) or more days in the work week *and* [italics in contract] (b) that employee works all scheduled hours during their work week. There shall be no pyramiding of overtime.

During the second stage of a four-step grievance procedure (which did not provide for arbitration) the employer determined that it had not been paying some employees for overtime work in accordance with Article VI. It was calculating overtime on a weekly rather than a daily basis. The affected employees were promptly reimbursed in accordance with the employer's revised understanding of the agreement. However, the union refused to settle the grievance on this basis and carried the grievance to the third stage where no settlement was reached. Both sides then agreed to waive the fourth step of the grievance procedure, which provided:

If no satisfactory settlement is arrived at within fifteen (15) days between the parties referred to in "c," the matter shall be taken up between a representative of the Union and a representative of the Employer. The parties will meet with each other within seven (7) days of a written request by either party to each other for such a meeting, and shall attempt to arrive at a settlement with a full hearing from all persons who know of the facts involved, both by the Union and the Employer. If no such settlement is arrived at within five (5) days after the meeting, then the Union may strike, and the Employer may lock out the employees.

On August 2, 1978 the defendant Rudd, as president of Local 282, posted a "Special Bulletin" on a bulletin board furnished by the employer pursuant to Article X, section 4 of the agreement, which provided:

The employer shall provide the Union with a bulletin board in the plant which the Union and its members shall have the right to use for the purpose of giving notice of Union activities, such as meetings, special events and other similar matters. The Union agrees that it will not publish or circulate any false or misleading remarks about the Employer, its products, its officers, and other personnel.

The August 2d bulletin, which is reproduced as an appendix to this opinion, called a meeting of all employees for 7:30 p. m. that day to discuss problems at the plant, particularly overtime pay. The bulletin stated, "Based on our interpretation of the contract, we believe this Company has <u>cheated</u> the employees out of <u>thousands of dollars</u> on overtime pay." (Underlining on original bulletin).

At the employees' meeting on the evening of August 2d there were complaints about overtime pay and talk of filing a lawsuit against the employer. Two union stewards testified that they, as well as other employees, felt that they had been cheated. However, there was no talk about a strike, no strike vote was taken and there was no authorization for a strike by the international union (a requirement of the union constitution). Nevertheless, in the early afternoon of August 3d many Davis employees walked off their jobs. The plant was shut down for the remainder of the day and operated on a limited basis between August 4th and 8th. Full production was resumed on August 9th.

## II.

### A.

The employer filed its complaint in the district court on August 11, 1978. It alleged that the statement in the special bulletin which accused The Davis Company of cheating its employees out of thousands of dollars violated the provision of Article X, section 4 of the agreement in which the union agreed not to "publish or circulate any false or misleading remarks about the Employer ...." It further alleged that the walkout of employees resulted from the false and misleading statement that the employer had cheated the employees and that the employer suffered damages from the loss of production during the walkout. The second count of the complaint charged that the publication "was willful and mali-

cious and ... was known by the Defendants to be untrue at the time of the statement ...." Special and punitive damages were sought for alleged defamation.

The local union and Rudd filed a joint answer admitting that Rudd acted as agent of Local 282 in posting the special bulletin and denying that the statements in the bulletin were false and misleading or willful and malicious. The defendants denied that the agreement had been breached or the employer defamed. The answer also contained a number of affirmative defenses: that the statements in the bulletin were privileged under the First Amendment as expressions of opinion and fair comment; that the statements related to matters of public interest; that jurisdiction over the dispute was preempted under the Act and that the strike complained of was a "protected activity" within § 7 of the Act. By amendment these defendants added the defense that the employer had failed to exhaust the grievance procedures set forth in Article III of the agreement. The international union filed a separate answer denying its involvement in the activities complained of by the employer. The international union also filed a motion for summary judgment. The district court eventually dismissed the international union as a defendant.

### B.

The district court entered a pretrial order which recited the issues as set forth in the pleadings and noted one additional defense, that the walkout was not proximately caused by the special bulletin. The order contained a stipulation that the employer "does not owe employees money for overtime pay."

In its findings of fact the district court held that the union's refusal to settle the grievance because it claimed the employees were entitled to double overtime was based on a "specious theory." Rudd had testified that he interpreted the overtime provision of the agreement as follows: if an employee scheduled to work five days in a given week worked 10 hours each of the first four days and 8 hours the fifth day, the employee was entitled to overtime pay for 16 hours, that is for two hours each of the first four days and for eight hours the fifth day. His justification for this interpretation was that federal law requires the payment of overtime for all work over 40 hours per week and that this was required in addition to the daily overtime covered by the agreement. He clung to this interpretation despite the fact that the employee in the example worked a total of only 48 hours during the week and the agreement provided there would be no "pyramiding of overtime." Rudd's testimony indicated that he understood "pyramiding" to refer to the payment of double overtime for hours worked in excess of eight hours per day. Rudd was an experienced negotiator. He had participated actively in the negotiations which resulted in the September 6, 1977 agreement. Rudd testified that he honestly believed his interpretation of the overtime provision was correct at the time he posted the bulletin and only learned it was incorrect after suit was filed.

Among its conclusions of law the district court held that publication of the special bulletin constituted a breach of Article X, section 4 of the agreement; that Local 282 was responsible for the action of Rudd, its agent; that the accusation of cheating against the employer was false, misleading and defamatory because it accused the employer of dishonesty and "there was clearly no basis for the interpretation asserted by Mr. Rudd of the overtime provision of the contract, Article VI, section 1." The court further concluded that false, misleading and defamatory statements are not protected under either the First Amendment or the National Labor Relations Act. Though also labeled a conclusion of law the court made a finding that the loss of production which it found the employer had suffered was proximately caused by Rudd's "false, misleading and defamatory statements posted on the bulletin board." A judgment was entered awarding damages of $7,416.95 jointly against Local 282 and Rudd.

### III.

■ We do not believe the decision in this case can properly turn on the defamation law of Tennessee as urged by the employer. The language about which the employer complains was published in the setting of a dispute concerning overtime pay of employees and, thus, was uttered "in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Letter Carriers v. Austin*, 418 U.S. 264, 279, 94 S.Ct. 2770, 2778, 41 L.Ed.2d 745 (1974). This being so, we look to federal law to determine whether recovery is permitted. Section 7 of the Labor Management Relations Act, 29 U.S.C. § 157 (1976),[1] guarantees the right of employees to freedom of speech in commenting on matters affecting their employment. However, the protection of the Act is forfeited by one who circulates a false statement with malice, that is with knowledge of its falsity or with reckless disregard for whether it is true or false. *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). There can be no recovery for defamation uttered or published in the setting of a labor dispute in the absence of malice. In a libel case involving a public figure to whom the same requirement of malice applied the Supreme Court described this requirement as follows:

> There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

■ Federal law encourages vigorous debate and permits intemperate and abusive language during organization campaigns and other labor disputes. In fact, it has been stated that the "most repulsive" speech enjoys immunity if it does not meet the test of actual malice. *Letter Carriers v. Austin, supra*, 418 U.S. at 284, 94 S.Ct. at 2781 quoting *Linn v. Plant Guard Workers, supra*, 383 U.S. at 63, 86 S.Ct. at 663. Moreover, expressions of opinion, though false, and couched in very strong language, are not to be treated as falsifications of facts. *Id.* Likewise, the use of hyperbole which would not be treated by a hearer or reader as intended to be literally believed is not actionable. *Id.* This court has held highly offensive language protected by § 7 of the Act, where it is clearly used in a rhetorical rather than a literal sense. In *N.L.R.B. v. Container Corp. of America*, 649 F.2d 1213 (6th Cir. 1981) (per curiam), a bulletin posted by a union vice-president accused the employer of treating employees in a disgraceful manner, referred to the general manager as a "slave driver" and referred to the employees as his "chain gang." And the publication involved in *Great Lakes Steel, Div. of National Steel Corp. v. N.L.R.B.*, 625 F.2d 131 (6th Cir. 1980) (order), referred to the employer's policy of providing ambulance service for an isolated plant as "murder for profit." Both publications were held entitled to the protection of § 7.

■ The district court did not find specifically that Rudd entertained serious doubts as to the truth of his claim that the employer was cheating employees with respect to overtime payments. The court found as a fact only that this claim was based on a "specious theory," and that there was no basis for Rudd's interpretation of the agreement. Neither of these findings necessarily connotes knowing falsity. In one of its conclusions of law the district court held that the accusation of cheating was false and that the falsity was "deliber-

---

1. Section 7 provides:

   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

ate" and therefore actionable. In a separate conclusion of law the district court held that "the conduct of Mr. Rudd lacks that degree of recklessness required for an award of punitive damages . . . ." Though these findings and conclusions are confusing and arguably inconsistent, we will not remand for a clarification. When defamation is claimed in cases under the federal labor laws a reviewing court should make an independent examination of the entire record to determine whether the speech or publication complained of is actionable. *Letter Carriers v. Austin, supra,* 418 U.S. at 282, 94 S.Ct. at 2780.

On the basis of our examination of the entire record, this court concludes that the district court erred in permitting recovery for defamation on the basis of the statements contained in the special bulletin. Though Rudd's interpretation of the contract proved untenable, there was no showing that the bulletin was published with actual knowledge of its falsity or in reckless disregard for its truth. Employees of the Davis Company who were members of Rudd's union had just exposed an error by the employer in its payment for overtime work. This revelation had occurred as a result of the employees' resorting to the grievance procedures contained in the agreement. The employer had been consistently misinterpreting the overtime provision in a way which deprived the employees of payments due them. The overtime language was either subject to more than one interpretation, or the employer had deliberately underpaid the employees. In this setting the union made its claim that the employer's second interpretation of Article VI was no more accurate than its first, and that the employees were still being underpaid. This dispute was very much alive when the bulletin was posted. A third-stage grievance meeting had ended in disagreement and the parties had agreed to waive the fourth step. Under these circumstances we do not believe the use of "cheated" in the special bulletin was actionable. The libel laws of Tennessee were preempted by federal labor law under which recovery is prohibited in the absence of actual mal-

ice. *Letter Carriers v. Austin, supra; Linn v. Plant Guard Workers, supra.* We conclude that actual malice was not proven and could not reasonably be inferred from this record. The finding of liability for defamation is reversed.

### IV.

#### A.

■ The district court found that the posting of the special bulletin constituted a breach of the agreement and that the walkout and consequent loss of production were proximately caused by the breach. The defendants do not contend that the limitation on use of the bulletin board contained in Article X, section 4, unlawfully deprived them of their § 7 right to disseminate union literature on the employer's premises. *See N.L.R.B. v. Arrow Molded Plastics, Inc.,* 653 F.2d 280, 283–84 (6th Cir. 1981). Indeed, such an argument, if made, would not be tenable. The restriction on use of the bulletin board was narrow—the board would not be used to publish or circulate false or misleading remarks about the employer, its products, its officers or other personnel. This appears to be a reasonable limitation on the exercise of § 7 rights, a limitation related to considerations of maintaining production and discipline. *Cf. Larand Leisurelies, Inc. v. N.L.R.B.,* 523 F.2d 814, 818–19 (6th Cir. 1975). False and misleading statements about an employer, posted on its premises by a union, would be expected to have adverse effects on discipline and production. Furthermore, the limitation was included in the section of the collective bargaining agreement which provided a bulletin board for exclusive use of the union. Thus a *quid pro quo* was given by the employer: an exclusive union bulletin board in exchange for an agreement that it would not be misused. The limitation was reasonable and the union was bound by it.

#### B.

■ The next question is whether the provision of the agreement was violated by

posting the special bulletin. The district court found the statement that the employer had cheated the employees to be false. There is substantial evidence to support this finding. In the pretrial order it was stipulated that the employer owed nothing to the employees for overtime pay. This being so, the employer had not cheated the employees by refusing to pay the double overtime which Rudd claimed was owed. Here, in contrast with our consideration of the defamation claim, we are not concerned with Rudd's actual knowledge of the falsity of the claim. He made a false statement, based on an extremely tenuous construction of the agreement language, a construction which he testified he later found to be wrong. We believe Article X, section 4, required him to engage in a more penetrating analysis of the overtime language before, not after, he had caused the special bulletin to be posted. The statement in the bulletin was misleading as well as false. The employees were misled by it to continue demanding additional overtime pay to which they were not entitled, as is now admitted. The agreement was breached by Rudd's causing the special bulletin to be posted and the answer admitted that Rudd was acting as the union's agent in posting the bulletin.

### C.

■ The district court also found that the walkout was proximately caused by the false and misleading matter in the special bulletin. The evidence on the cause of the walkout is sparse and certainly does not compel the finding which the district court made. However, no other explanation of the walkout was presented by any of the parties. It came immediately on the heels of the breakdown of the grievance proceedings, the posting of the bulletin and the meeting of which the bulletin gave notice. The question of overtime pay was the central theme of each of these events. It was apparently the principal matter discussed at the employees' meeting. Though no strike vote was sought or taken, it was reasonable for the district court to infer from all these circumstances that the August 3d walkout

did result from the posting of the special bulletin containing language which breached a provision of the collective bargaining agreement. This inference was supported by evidence of a communication to the employer from the business agent of the union which stated that the walkout was over the grievance on overtime. The finding of causation was not clearly erroneous.

### D.

The union and Rudd contend this action should have been dismissed for failure of the employer to exhaust contractual remedies. Our examination of the entire agreement fails to disclose any remedies which the employer was required to exhaust before commencing this action. Article III, section 1 of the agreement, relied upon by the defendants, has no application to the dispute which resulted in this lawsuit.

### V.

The employer does not seek to recover from Rudd individually. It could not do so because § 301(b) forbids recovery from union members or officers for breach of a collective bargaining agreement. *Complete Auto Transit v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981). The remaining question is whether the union was subject to a judgment for damages on the basis of its activities as disclosed by this record.

■ The employer argues that the strike was unlawful under the contract because the union failed to observe the five-day cooling off period prescribed in step four of the grievance procedure, *ante* p. 560. However, the only evidence was to the effect that this step was waived by mutual agreement. In fact, the Davis plant manager stated as a witness that the employees were free to strike after the failure to settle during the third stage of grievance proceedings. The agreement did not contain a general "no strike" clause. Thus, there was no basis for finding that the walkout constituted a breach of contract. Even if it had been an illegal strike, however, the union could not be held liable in

the absence of a showing that it had either authorized, participated in or ratified the strike. *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 216, 100 S.Ct. 410, 413, 62 L.Ed.2d 394 (1979); *Complete Auto Transit v. Reis, supra*, 451 U.S. at 414, 101 S.Ct. at 1844; *Southern Ohio Coal Co. v. United Mine Workers*, 551 F.2d 695 (6th Cir.), cert. denied, 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 155 (1977); *North American Coal Corp. v. Local 2262, U.M.W.A.*, 497 F.2d 459 (6th Cir. 1974); *cf. United Steelworkers of America v. Lorain*, 616 F.2d 919, 921 (6th Cir. 1980), cert. denied, 451 U.S. 983, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981) (applying § 6 of the Norris-LaGuardia Act). The evidence was clear that the walkout was neither authorized nor ratified.

The employer also argues that damages were awarded for defamation and breach of contract, not for conducting a strike; that the walkout caused a loss of production which was determined to be the proper measure of damages for the wrongful acts of Rudd and the union in posting the special bulletin. This is faulty reasoning. The damages resulted from failure of the employees to remain on their jobs, not from the act of posting the special bulletin. The posting of the bulletin may have been the catalyst which precipitated the walkout. However, the cause of the strike is irrelevant. In the absence of a showing that the union authorized or ratified the walkout, the damages which it caused may not be recovered from the union. The employer made no attempt to show any damages which flowed directly from the falsehood contained in the bulletin. In the absence of such showing, it was not entitled to recover in this § 301 action for breach of contract.

The judgment of the district court is reversed with directions to dismiss the action. The defendants-appellants will recover costs on appeal.

## APPENDIX

---

## SPECIAL BULLETIN

TO: All Davis Company Employees

FROM: Willie Rudd, President UFWA Local 282

There will be a very important and <u>urgent</u> meeting tonight, August 2, 1978, 7:30 p. m. at 2881 Lamar Avenue to discuss problems at your plant, <u>particular</u> your <u>overtime pay.</u>

Based upon our interpretation of the contract, we believe this Company has <u>cheated</u> the employees out of <u>thousands of dollars</u> on overtime pay.

It is important that each employee be present for this meeting. We will discuss and decide what course of action we will take to solve this problem.

8/2/78

WEICK, Senior Circuit Judge, dissenting:

I respectfully dissent. In my opinion, neither the Labor Management Act, 29 U.S.C. § 185 or the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, or any other federal law to my knowledge, gives to the labor union a license to intentionally injure the employer by circulating defamatory or insulting material about him known to be false. *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The district court had pendant jurisdiction under *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), to apply Tennessee tort law on defamation.

The controversy in this case did not arise out of campaign oratory of union employees and the employer in a Labor Board conducted election. It arose out of deliberate intentional acts of a local labor union designed to injure the employer by false defamatory material.

The district court adopted findings of fact and conclusions of law which are plain and understandable, although some of them were mixed.

The district court found:

The union, however, refused to settle the grievance. The union claimed that the employees were entitled to double overtime based on the following *spurious* theory: if an employee works four 10-hour

days and one 8-hour day, for a total of 48 hours, he should be paid daily overtime for all hours in excess of 8, or 8 hours for the week and, the union claimed, the employee should receive *in addition,* 8 hours overtime for the 8-hour day, for a total of 16 hours overtime for the week. The union's claim was made in spite of the clear prohibition against the pyramiding of overtime in the collective bargaining agreement. (emphasis added).

.    .    .    .    .

2. The posting of the bulletin of August 2, 1978, which accused the plaintiff of cheating its employees out of thousands of dollars, constituted a breach of Article X, § 4 of the collective bargaining agreement which forbids the publication or circulation by the union of any false or misleading remarks about the employer or any of its officers.

3. At all times relevant to this suit Willie Rudd was acting president of the local, and as the local's agent acting within the course of his employment the union is responsible for his acts. *See* 29 U.S.C. § 185(b)(e).

4. The accusation that The Davis Company "cheated" employees was false and misleading and was also defamatory in that it falsely accused the company of dishonesty. Furthermore, there was clearly no basis for the interpretation asserted by Mr. Rudd of the overtime provision of the contract, Article VI, Section 1. The falsity contained in the notice posted on the bulletin board by Rudd was deliberate, and therefore actionable. *Letter Carriers v. Austin,* 418 U.S. 264, 283, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974). Because Mr. Rudd was acting as the president of the local, the local is liable for his defamatory statements, and both Mr. Rudd and the local are jointly liable on the defamation cause of action.

5. False, misleading, and defamatory remarks are not protected under the First Amendment or the National Labor Relations Act. *Timpte, Inc. v. NLRB,* 590 F.2d 871 (10th Cir. 1979); *Bettcher Manufacturing Corporation,* 76 NLRB 526 (1948); *Maryland Drydock Company v. NLRB,* 183 F.2d 538 (4th Cir. 1950).

6. The walkout by the employees and the resulting loss of production by the plaintiff was proximately caused by Mr. Rudd's false, misleading and defamatory statements posted on the bulletin board.

7. When a company suffers a loss of production as a result of a breach of contract or other wrongful acts, the company is entitled to damages measured by the loss of fixed costs of operation which are not offset by income otherwise derived or attributable to productive labor. *Sheet Metal Workers International Association v. Atlas Sheet Metal Company,* 384 F.2d 101, 109 (9th Cir. 1967). Based on the testimony of the company's certified public accountant and the custodian of the production records, that amount in damages equals $6,713.82. The plaintiff is also entitled to the costs of obtaining private security service in the amount of $703.13 for total compensatory damages in the amount of $7,416.95.

The Union at no time either in the district court or here disputed the accuracy of the computation of the damage award.

The Collective Bargaining Agreement did not provide for arbitration so that the employer had no remedy except an action for damages.

In Black's Law Dictionary, Fifth Edition, the author defines the verb cheat:

To deceive and defraud. It necessarily implies a fraudulent intent. The words "cheat and defraud" usually mean to induce a person to part with the possession of property by reason of intentionally false representations relied and acted upon by such person to his harm. They include not only the crime of false pretenses, but also all civil frauds, and include all tricks, devices, artifices, or deceptions used to deprive another of property or other right. See Fraud.

Without question, the Union accused the company of criminal activity.

It is submitted that the district judge in trying this case without a jury had the

right to and did make credibility assessments. He certainly did not believe the testimony of the Union President Rudd, whose theory as to double payment of overtime he found was "spurious". Rudd accused the company of dishonesty when he actually knew that the company did not intentionally withhold any money knowing it to be owing to its employes. If this does not involve malice, what is it?

In making his findings, the district judge could take into account inferences from proven facts logically deductible therefrom. He found that the walkout and damage sustained by the employer resulted proximately from the libelous statements asserted by the union on the bulletin board, which also violated the Collective Bargaining Agreement.

One other matter is noteworthy. The Collective Bargaining Agreement provided in Article III Section 4(d):

> If no such settlement is arrived at within five (5) days after [the last meeting under the grievance procedure], then the Union may strike and the Employer may lock out the employees. App. p. 145.

The purpose of the five day period after the last meeting was to provide for a cooling off time before the Union can strike. The Union in its brief erroneously calls the walkout a strike, which it was not. The last meeting was on June 2, and the employees met at night after the meeting. No strike was authorized at the meeting. The walkout occurred on the following day, June 3. If it was a strike which the Union claims it was, then it was an unlawful strike in violation of the Collective Bargaining Agreement, for which it was liable in damages.

In my opinion, the libelous statements were not authorized by the First Amendment to the Constitution, nor did they constitute "protected activity" under § 7 of the Act.

In my opinion, the findings of fact and conclusions of law adopted by the District Judge McRae were supported by substantial evidence and are not clearly erroneous. The majority takes the position that there was no evidence to support them, but this in my opinion is incorrect. This is a clear case of liability from which the Union and its President have no exemption.

I would affirm the judgment of the district court.