DTR INDUSTRIES, INC.,
Petitioner/Cross–
Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent/Cross–
Petitioner.

Nos. 93–5784, 93–5906.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 5, 1994.

Decided Nov. 3, 1994.

James A. Rydzel (argued and briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, for petitioner cross-respondent.

Frederick Calatrello, Director, N.L.R.B., Region 8, Cleveland, OH, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Linda Dreeben (briefed), Robert J. Englehart (argued and briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for respondent cross-petitioner in No. 93–5906.

John C. Truesdale, Executive Secretary, N.L.R.B., Office of the Gen. Counsel, Washington, DC, Frederick Calatrello, Director, Charles Z. Adamson, N.L.R.B., Region 8, Cleveland, OH, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Linda Dreeben (briefed), Robert J. Englehart (argued and briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for respondent cross-petitioner in No. 93–5784.

Before: KENNEDY, RYAN, and NORRIS, Circuit Judges.

RYAN, Circuit Judge.

The petitioner, DTR Industries, Inc., seeks review of an order of the respondent, National Labor Relations Board, vacating the results of an election in which a majority of the petitioner's employees voted against representation by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW. The petitioner further challenges the Board's findings that the UAW obtained a card majority and that the petitioner repeatedly violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), as well as the Board's bargaining order arising out of these findings. The Board cross-petitions for enforcement of its order.

Assuming, without deciding, that the UAW obtained a card majority, the sole issue for decision is whether substantial evidence supported the Board's issuance of an order to bargain. Because we conclude that the Board failed to demonstrate that a fair election could not now be held, we deny enforcement of the Board's order.

I.

The petitioner manufactures components for sale to automobile manufacturers. From its inception in 1988, the petitioner has built a customer base composed primarily of foreign automakers Honda, Mazda, and Toyota. The petitioner has been the sole source supplier of its products for all of these customers.

In September 1989, the UAW undertook an organizing campaign among the petitioner's approximately 75 production and maintenance employees or "associates." Over the span of a few days, 59 employees signed single-purpose union authorization cards. The cards stated:

> This card will be used to secure recognition and collective bargaining for the purpose of negotiating wages, hours, and working conditions.

**YOU HAVE THE RIGHT UNDER FEDERAL LAW TO ORGANIZE AND JOIN A UNION**

It is the policy of the UAW to waive initiation fees for ALL employees who join the union before thirty (30) days after the signing of an initial collective bargaining agreement.

By joining the UAW you have the support of the world's largest Industrial Union.

Despite the seeming card majority, the UAW did not use the cards to demand bargaining. Rather, they filed an election petition, and an

election was scheduled for November 17, 1989.

Well before the onset of the UAW's organizing activities, according to Board findings, the petitioner had undertaken efforts to develop a competitive wage policy. In June 1989, the petitioner determined that it would implement wage increases in a two-step process, a short-term increase to address immediate employee concerns, followed by a long-term wage policy. On September 1, 1989, still prior to any UAW activity, the petitioner announced a five percent short-term increase. It expected at that time to have its long-term policy ready by October 1989.

After the union filed its representation petition, the petitioner continued to develop its long-term wage policy. After stipulating with the UAW that the petitioner's group leaders were actually supervisors excluded from the proposed bargaining unit, the petitioner increased group leader wages from the $7.50 per hour range to $10 per hour. In response to employee questions, the petitioner explained that it was able to implement the group leaders' salary increase because of their supervisory status. The petitioner further explained that the law forbade it from changing or making promises to change unit members' wages and benefits until after the election. Nevertheless, the petitioner continued to work on the wage policy, and on November 14, reviewed a consultant's proposal that called for an increase to a top wage of $10.25 per hour over 24 months. On November 16, the day before the election, employee Brad Fisher asked human resources director Alan Haynes, whether "if we were to vote no, when would we hear about the wage package?" Haynes reportedly responded, "if we were to vote no in the election, that after the votes were counted ..., they would announce the wage package." No final decision was made on the long-term wage policy prior to the election.

While the election campaign was ongoing, group leaders Joseph Brinkman and Robert Falk commented to some employees that if the UAW prevailed at the election, customers Toyota and Honda were likely to assign at least 50 percent of their business to another contractor. Quality control director Gregory Lewandowski allegedly made a similar statement to employee Martin Clum. In addition, group leader Dorothy Jordan commented to one or more employees that she was looking for work elsewhere, because either her group or the petitioner would close its doors if the petitioner were forced into unionization. Also, according to employee James McClain, Brinkman and Jordan asked him to identify employees who were union adherents, a request which McClain declined.

On November 10, 1989, one week before the election, the petitioner's president, Yuji Kobayashi, distributed a four-page letter to employees, in which he opined that "it would be irresponsible on my part if I did not attempt to summarize for you what I believe are the very critical factors in this election and request that you give them serious consideration before you cast your vote." Kobayashi's letter went on to explain that because the petitioner sole-sourced to its customers, the "business would automatically be reduced if the union wins the election and our customers took away 50 percent of our sole source business." Kobayashi also noted in the letter that U.S. auto companies typically required a unionized supplier to build up a 90–day inventory prior to the expiration of the supplier's collective bargaining agreement. Then, explained Kobayashi, if the supplier negotiated a new collective bargaining agreement without a strike, employee layoffs were required to reduce the built-up inventory. The letter concluded with the following observation:

> Having a union will hurt our business and our chances for success. We will lose some or all of our sole source business and create the danger of losing the confidence of our customers. Let us show what DTR and its associates can do together as a team without the union. You have our attention and our commitment. We will listen and we will respond and we will have a mutual commitment to each other.

In addition, during the election campaign, the petitioner installed suggestion boxes and a toll-free telephone number for processing employee comments and questions. According to the petitioner, these measures were necessary to keep lines of communication

open with employees, because theretofore, the employees had addressed their concerns to group leaders, who the employees now viewed with distrust because of the upcoming election. The petitioner undertook improvements, based on information received through the suggestion boxes and the toll-free line.

The UAW lost the election by a single vote. The November 17 election fell on a Friday, and on the following Monday, November 20, the petitioner adopted the wage proposal it had reviewed on November 14.

On February 8, 1990, the UAW filed an unfair labor practice charge, accusing the petitioner of refusing to bargain in violation of section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). Although the UAW had never demanded bargaining, it took the position that the petitioner was duty-bound to bargain by virtue of the 59 authorization cards. On March 23, 1990, the Board's General Counsel issued its complaint and notice of hearing, alleging that the petitioner not only had violated section 8(a)(5), but also had committed numerous violations of section 8(a)(1) by promising and granting wage and benefit increases, by threatening to close the company or lay off employees if the union prevailed, by instituting a new grievance procedure, and by interrogating at least one employee.

Following six days of administrative hearings, the ALJ issued his decision, in which he concluded that the General Counsel had failed to prove the section 8(a)(5) violation. The ALJ based his conclusion on his finding that union agents had misrepresented the purpose of the authorization cards to at least 31 of the 59 employees signing the cards. On this basis, the ALJ rejected the General Counsel's request for a bargaining order. The ALJ did find, however, that the petitioner had violated section 8(a)(1) as alleged. On this basis, the ALJ issued a cease-and-desist order and awarded costs to the General Counsel.

Both the General Counsel and the petitioner filed exceptions to the ALJ's decision. The Board agreed with the General Counsel that the union had not employed misrepresentations to procure the necessary majority

of employee signatures, and on this basis, issued the order to bargain that is the subject of these cross-petitions.

## II.

■ Our mission in reviewing an order of the Board is well-established. We may not disturb those factual findings by the Board or its administrative law judge that are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). Evidence is substantial when, on the record as a whole, the evidence "is adequate, in a reasonable mind, to uphold the [Board's] decision." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986). However, "[s]ubstantial evidence ... is more than a mere scintilla of evidence." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993). Therefore, our review must include consideration of any record evidence that runs contrary to the Board's findings. *Id.*

■ In addition, because section 10(c) of the NLRA, 29 U.S.C. § 160(c), endows the Board with authority to fashion appropriate remedies over and above cease-and-desist relief, the remedy devised by the Board is entitled to "special respect by [the] reviewing court[ ]." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). In this regard, the Board acts within its discretion in issuing a bargaining order, either (1) "in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," whether or not the union has established majority status, or, (2) where the union has established majority support, upon

> a lesser showing of employer misconduct ... [i]f the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order....

*Id.* at 613–15, 89 S.Ct. at 1939–41.[1] *Accord NLRB v. Flex Plastics, Inc.,* 726 F.2d 272, 276–77 (6th Cir.1984). It is an abuse of discretion, however, for the Board to impose a bargaining order in the case of "minor or less extensive unfair labor practices, ... because of their minimal impact on the election machinery." *Gissel,* 395 U.S. at 615, 89 S.Ct. at 1940.

### III.

#### A.

The petitioner's primary argument is that the Board failed to establish that a fair election could not now be held, in that the alleged unfair labor practices either were not supported by substantial evidence or were minor in nature.[2] In this regard, the petitioner first contends that its representations that UAW recognition would result in lost business did not constitute threats because they did not relate to actions within the petitioner's control. Rather, the statements objectively reflected what the petitioner's customers would do to protect themselves from the effects of a union work stoppage.

Next, the petitioner claims that the Board's finding that the petitioner conditioned its post-election wage increase on the union's defeat is not supported by any evidence, much less by substantial evidence. The petitioner further argues that its plan, prior to the UAW's organizing drive, to bring the employees up to competitive wage, placed the petitioner in a no-win situation: whether it implemented the increase before or after the election, the union would claim the salary hike was unfair, either because the increase was intended to dissuade a vote for the union, or because it was intended to reward the employees for voting down the union.

Third, the petitioner maintains that its grievance procedure improvements were legitimate business changes that were necessitated by the employees' reluctance to continue their practice of complaining to supervisory personnel. In any event, the petitioner characterizes the grievance process modifications as too *de minimis* to support a bargaining order.

The petitioner also argues that the Board's order is defective because the Board failed to consider whether lesser remedies might adequately alleviate any lingering election taint. Moreover, the petitioner claims that the Board erred in not considering evidence that any such taint was unlikely, given that the proposed bargaining unit has grown threefold or more, with over 75 percent of its constituents hired after the 1989 election. For these reasons, the petitioner contends that a new election clearly would be the more reliable indicator of employee will.

In response, the Board argues that substantial evidence supported all section 8(a)(1) violations. First, according to the Board, even if the petitioner's predictions of lost business were predicated on actions outside the petitioner's control, the petitioner failed to link the predictions to objective facts. As to the charge that the petitioner unlawfully conditioned its post-election wage increase on the UAW's defeat, the Board points to statements by Kobayashi, Lewandowski, and Haynes, as substantial evidence supporting this violation. In addition, the Board maintains that the petitioner did not make a final decision on the salary hike until the election results were known, further evidencing the petitioner's unlawful purpose. Finally, the Board maintains that substantial evidence supported the Board's finding that the petitioner unlawfully interrogated employee McClain concerning the identity of union supporters.

As to the petitioner's contention that the Board abused its discretion in ordering bargaining, the Board argues that hallmark violations, such as threatened plant closure, are always sufficient to support a bargaining order. In addition, the Board maintains that it was not required to consider changed circumstances, such as the increased size of the bargaining unit since the 1989 election, in

---

1. According to the Board, this case falls in the latter category.

2. The petitioner also challenged the Board's jurisdiction over the section 8(a)(1) charges and the

Board's finding that the UAW obtained a card majority, issues we find unnecessary to address here.

determining the propriety of the bargaining order. Nevertheless, the Board contends that it did evaluate the order in light of the changed circumstances, and found the order valid despite the heavy turnover.

### B.

In *M.P.C. Plating, Inc. v. NLRB*, 912 F.2d 883 (6th Cir.1990), we identified three requirements that, if satisfied, will sustain an order to bargain:

1. The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair practices on its part and has requested bargaining;

2. The employer has dissipated significantly the Union's majority by the commission of section 8(a)(1) violations; and

3. A fair election cannot be had under all the circumstances of the particular case.

*Id.* at 888. As we further explained, elections are preferred to bargaining orders. For this reason, the Board cannot depend on conclusory statements, but rather "must make factual findings and must support its conclusion that there is a causal connection between the unfair labor practices and the probability that no fair election could be held." *Id.* (emphasis omitted).

In *M.P.C.*, we considered the conduct of an employer who, in the wake of an organizing campaign, attempted to transfer all of its employees to a temporary agency, asking the temporary service to assist in fabricating a paper trail that would indicate, falsely, that the transfer had been planned prior to any organizing drive. The employer then told its employees that they would be fired if they did not accept the transfer, a threat which the employer later carried out. While we agreed with the Board that the employer's actions violated sections 8(a)(1) and 8(a)(3), we refused to enforce the Board's bargaining order, because there were "no findings ... that 'a fair election c[ould] not be had under all the circumstances.'" *Id.* at 889. Specifically, we relied on the fact that, in the four years since the employer's illegalities, there had been a complete turnover in employees.

In support of its position that the specificity requirement of *M.P.C.* required the Board to consider the efficacy of traditional, less extreme remedies, the petitioner relies on *Montgomery Ward & Co. v. NLRB*, 904 F.2d 1156 (7th Cir.1990). In *Montgomery Ward*, the Seventh Circuit stated that, in demonstrating that a fair election is improbable, the Board not only must document "the serious nature of the unfair labor practices" before concluding that the alleged illegalities presuppose "a 'lingering' and 'pervasive' effect," *id.* at 1158–59, but also must explain why less drastic remedies are insufficient to warm the chill:

[T]he Board met its initial burden by adequately documenting and discussing the number and severity of the unfair labor practices along with the residual effect of these violations on the bargaining unit. We do not question these findings but conclude nonetheless that we must deny enforcement of the Board's order and remand for further consideration on the grounds that the Board failed to "articulate specifically the inadequacy of traditional remedies." ... We find, therefore, that it was an abuse of discretion for the Board to impose a bargaining order without sufficient analysis and discussion of the adequacy of traditional remedies.

*Id.* at 1159 (citations omitted). *See also Avecor, Inc. v. NLRB*, 931 F.2d 924, 938 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992).

Similarly, in *NLRB v. Rexair, Inc.*, 646 F.2d 249 (6th Cir.1981), we refused to enforce a bargaining order issued after the union had obtained a card majority, but had lost the election. There, the Board's order offered only the most summary boilerplate rationale for its order:

The Board has failed to support its conclusion that a bargaining order is the only satisfactory remedy in the present case. The ALJ simply recites his findings of the Company's improper activities and then states that a cease-and-desist order could not cure these wrongs. There is no analysis of the residual impact or possible recurrence of these violations, nor explanation

why a cease-and-desist order would fail to prevent possible recurrence.

*Id.* at 251.

However, as the Board points out, we have adhered to a somewhat less rigorous specificity requirement where the Board has presented substantial evidence of so-called "hallmark" violations, such as disciplinary discharges of union activists or actual or threatened plant closure. In *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292 (6th Cir.1988), the Board produced substantial evidence that at least two company officials, including the company president, repeatedly threatened that " 'if the union come in [sic] that they [are] going to close the doors down.' " *Id.* at 1294. These threats were coupled with the superintendent's posting of a petition disavowing union support, which he monitored to ensure that all employees signed. Noting that "[c]ourts have repeatedly held that . . . threats of plant closure are 'among the most flagrant' of unfair labor practices," *id.* at 1301 (citations omitted), we rejected the employer's contention that, under *Rexair,* the Board's bargaining order was too conclusory to withstand scrutiny:

> The Board here relied on the relatively small size of the bargaining unit, the level of management involved, and the extensive and egregious unfair labor practices committed by the Company. Particularly severe and pervasive were the repeated threats of plant closure which the Board found would have lingering effects that could not be readily dispelled.

*Id.* We referred to a consensus among the courts that, "in view of an employee's natural interest in continued employment, threats of plant closure are 'among the most flagrant' of unfair labor practices." *Id.* (citations omitted). We rejected, however, the approach of some circuits that have held that plant closure threats alone will support a bargaining

order, adhering instead to a "totality of the circumstances" approach. *Id.* at 1302.

In contrast, we have held that some types of violations, alone or in combination, rarely will justify enforcement of a bargaining order. For example, in *NLRB v. Arrow Molded Plastics, Inc.,* 653 F.2d 280 (6th Cir.1981), we observed that such violations as "improper grievance solicitation before the election, or persistent promises, grants and withholding of benefits, or [an] unlawful no-distribution rule . . . f[a]ll far short of actual or threatened antiunion plant closures, disciplinary discharges, and employee surveillance which characterizes the cases in which this Court has enforced bargaining orders." *Id.* at 284. We further stated that the passage of four years "since the first election militates in favor of a rerun election." *Id.*

 Because we have treated bargaining orders issued upon a finding of threatened plant closure differently, it is important to determine whether substantial evidence supported the Board's finding—in this case, that the petitioner had threatened layoffs and plant closing. As the petitioner points out, there is a distinction between "threats" motivated by union animus and "predictions" about the probable economic consequences of unionization; the former clearly violates section 8(a)(1), while the latter may be protected by section 8(c).[3] *Pentre Elec.,* 998 F.2d at 369.

In *Pentre Electric,* we considered company statements, in the wake of a union election, that company owners feared erosion of the customer base if the union prevailed. One owner, the company president, told employees that he " 'did not think we would have a customer base or we would certainly not have the same customer base if we were to go to union.' " *Id.* at 366. His observation was based primarily on the fact that "many of [the company's] customers did not employ union contractors." *Id.* The second owner made similar statements, and, in explaining

---

**3.** Pursuant to section 8(c) of the National Labor Relations Act,

The expressing of any views, argument, or opinion, or the dissemination thereof, . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no

threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). This provision is designed to " 'encourage free debate and more adequately protect the First Amendment rights of employers and unions.' " *Pentre Elec.,* 998 F.2d at 368 (citation omitted).

that unionization would create the need to " 'establish new customers,' " he declared, " 'I really don't want to go through that again, that's exactly where I was seven years ago, when we started [the company,] . . . and I'm not prepared to do that again.' " *Id.* at 367.

On these facts, we held that the Board's finding that the company had violated section 8(a)(1) was not supported by substantial evidence. As we observed, an employer may " 'make a prediction as to the precise effects he believes unionization will have on his company,' " *id.* at 369 (citation omitted), providing the statement satisfies the following criteria:

> "[T]he prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control. . . . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion. . . . As stated elsewhere, an employer is free only to tell 'what he reasonably believes will be the likely economic consequences of unionization that are outside his control,' and not 'threats of economic reprisal taken solely on his own volition.' (citations omitted)."

*Id.* (quoting *Gissel,* 395 U.S. at 618–19, 89 S.Ct. at 1942).

In addition, we clarified in *Pentre Electric* that it is the Board's burden to demonstrate "that section 8(c) does not protect an employer's predictions of the consequences of unionization." *Id.* at 371. Once the employer had articulated the objective basis for its prediction, it was incumbent on the Board to demonstrate that the prediction was not objective in nature or was untruthful. On this basis, we distinguished our facts from *Indiana Cal–Pro,* 863 F.2d at 1298–99, where the employer offered no rationale for its bald-faced threat to close its doors if the union prevailed. *Pentre Elec.,* 998 F.2d at 371.

### C.

 Unlike *Indiana Cal–Pro,* the purported plant closure threats identified here are protected by section 8(c). For example, the Kobayashi letter, taken in context, is an objective prediction of what the petitioner's customers would do in the event the union prevailed, and thus is protected speech. Kobayashi explained in the communication that companies that sole-sourced with the petitioner were likely to split their business in order to have an alternative supply source in the event of a strike. As *Pentre Electric* demonstrated, Kobayashi was entitled to make this statement based on his industry experience and his knowledge of the petitioner's customer base, at which point it was incumbent on the Board to prove its falsity. The Board presented no such evidence. Nor did the Board demonstrate that the letter's other challenged statement was either subjective or untruthful. Kobayashi stated in the letter that "U.S. auto companies force their unionized suppliers to build a 90–day inventory of parts before any labor contract termination." He further stated that "if the contract is negotiated without a strike, employees are laid off while the inventory is used." According to the Board, the testimony of Gary Rayle, a plant manager for the petitioner's associate corporation, Norbalt, proved the falsity of these statements. Rayle, however, testified that three out of five of Norbalt's contract negotiations with U.S. auto companies adhered to the precise scenario outlined by Kobayashi. Moreover, according to Rayle's testimony, on the other two occasions, the auto companies demanded the buildup, but it proved unnecessary when Norbalt succeeded in reaching early agreement with the UAW.

The majority of the other alleged plant closing threats merely repeated the observations made in Kobayashi's letter. Typical of these statements was employee McClain's testimony describing group leader Brinkman's observation that the petitioner probably would lose 50 percent of Honda's business, and probably wouldn't get new business from Ford Motor Company. The only alleged threat that did not fall in this category was a statement attributed to group leader

Dorothy Jordan, that she was circulating her résumé because the petitioner would close if the union prevailed. This personal reflection by a first-line supervisor simply is too inconsequential to constitute substantial evidence of a hallmark violation.

The other violations identified by the Board—the wage increase, changes in the grievance procedure, and an isolated question to a single employee—are not of the hallmark variety. *See Arrow,* 653 F.2d at 284. Moreover, the Board's findings relating to the wage increase are not supported by substantial evidence. For example, the ALJ largely relied on employee Clum's testimony to establish the violation, despite the ALJ's observation, only paragraphs earlier, that "Clum lied throughout the hearing." Other statements identified by the Board, viewed in context, were in response to argumentative questioning by employees, such as the Fisher query, "if we were to vote no, when would we hear about the wage package?"

Moreover, there is another key distinction between this case and *Indiana Cal–Pro*—the passage of time since the 1989 election, and the accompanying changed composition of the bargaining unit. During the four years following the election, the proposed bargaining unit increased from approximately 75 employees to almost 250. It appears that only about 53 of the original 75 employees are still members of the proposed bargaining unit. Thus, only 20 to 25 percent of those employees now eligible to vote were present four years ago for the first election, and the affected unit has increased more than threefold.

 As this court repeatedly has held, such changed circumstances can be determinative in evaluating whether the Board justifiably has rejected the preferred remedy of a new election in favor of a bargaining order. *See M.P.C.,* 912 F.2d at 888; *Arrow,* 653 F.2d at 284. *See also NLRB v. Frederick's Foodland, Inc.,* 655 F.2d 88, 90 (6th Cir. 1981); *NLRB v. Gibraltar Indus., Inc.,* 653 F.2d 1091, 1099 (6th Cir.1981).

What the substantial evidence present here establishes is only "minor or less extensive unfair labor practices" that will not support an order to bargain. *Gissel,* 395 U.S. at 615, 89 S.Ct. at 1940. This conclusion is even more compelled in light of the five years intervening between the alleged violations and today, and the dramatic changes in the size and composition of the workforce. Given all of these circumstances, there is not substantial evidence to support the Board's conclusion that a fair election probably could not now be held.

**IV.**

We conclude that the Board's findings that the petitioner engaged in hallmark section 8(a)(1) violations are not supported by substantial evidence. Given the minor nature of any violations arguably supported by the evidence, enforcement of a bargaining order now, with a workforce bearing little resemblance to that of five years ago, would be wholly inappropriate.

For the foregoing reasons, we **DENY** enforcement of the Board's bargaining order.