**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0632n.06
Filed: October 20, 2008

Nos. 07-2139, 07-2324

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DTR INDUSTRIES, INC., | ) | |
| | ) | |
| **Petitioner/** | ) | **ON PETITION** FOR REVIEW |
| **Cross-Respondent,** | ) | AND CROSS-APPLICATION |
| | ) | FOR ENFORCEMENT OF AN |
| v. | ) | ORDER OF THE NATIONAL |
| | ) | LABOR RELATIONS BOARD |
| NATIONAL LABOR RELATIONS | ) | |
| BOARD, | ) | |
| | ) | **O P I N I O N** |
| **Respondent/** | ) | |
| **Cross-Petitioner.** | ) | |
| | ) | |

**Before:  MOORE and SUTTON, Circuit Judges; ALDRICH,[*] District Judge.**

**KAREN NELSON MOORE, Circuit Judge.**  The National Labor Relations Board ("NLRB") concluded that the Petitioner, DTR Industries, Inc. ("DTR"), violated the National Labor Relations Act ("NLRA") when attempting to dissuade its employees from unionizing.  DTR seeks review of two parts of the NLRB's order.  First, DTR asserts that Executive Coordinator Thomas King's ("King's") statements to employees were objective predictions, not threats of layoffs should employees unionize.  Second, DTR argues that the NLRB incorrectly credited employee Daniel Gahman's ("Gahman's") testimony when concluding that DTR threatened to discipline Gahman for his pro-union activities and gave Gahman the impression that DTR was surveilling his union

---

[*]The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

activities. The NLRB filed a cross-application for enforcement of the order. For the following reasons, we **ENFORCE** the NLRB's order.

## I. BACKGROUND

### A. Factual Background

DTR manufactures hose and rubber anti-vibration products for use in automobiles. DTR employs approximately 800 individuals at its Bluffton, Ohio facility. DTR is a "just in time" operation, manufacturing only the quantity purchased by a buyer and not producing excess parts for inventory. Joint Appendix ("J.A.") at 508-09 (Dec. 18, 2003, NLRB Hr'g Tr., King Test. at 467:4-468:20). Additionally, DTR is a sole-source supplier for three-fourths of its customers, with those customers relying entirely upon DTR for the production of a given product.

In summer 2002, some DTR employees began a union-organizing campaign. Gahman, a union supporter, was involved in that effort to obtain union representation. Shortly after the organizing campaign began, DTR management made its disapproval of his activities clear to Gahman. In early August, Gahman's supervisor told Gahman that he was required to attend a meeting with King and several other supervisors. King, DTR's Executive Coordinator, reports directly to DTR's president, COO, Chairman, and CEO. King is responsible for DTR's human resources and had been with DTR for over a decade as of 2003.

According to Gahman's testimony, at the meeting King informed Gahman that King was aware of Gahman's support of unionization and knew Gahman attended union meetings. In addition, King made it clear that he knew about several things that Gahman had mentioned at a union meeting the night before; King's knowledge left Gahman feeling spied upon and feeling as though he "was

being betrayed by the UAW." J.A. at 223 (Dec. 17, 2003, NLRB Hr'g Tr., Gahman Test. at 183:9). Specifically, King accused Gahman of sharpening a knife for an employee in exchange for the employee signing a union card. But Gahman explained that he sharpened the knife as a favor for the employee while explaining the benefits of unionization. Next, King said that he had heard that Gahman refused to install a fan for an employee who did not support the union. Gahman, however, responded by stating he installed fans whenever there was a work order. Gahman testified that at the conclusion of the meeting King stated that if he continued to hear about Gahman's union support, King would discipline Gahman for the knife and fan incidents. Gahman said that he would discontinue his union support and "that there won't be no further problems." J.A. at 223 (Gahman Test. at 183:22-23).

After the meeting with Gahman, DTR continued to make its disapproval of unionization clear to its employees. King's public comments regarding the effects of unionization are the primary focus of this case. DTR conducts monthly President Associates ("PA") meetings where management discusses company issues with its employees. On August 29, 2002, King used one of those PA meetings to address the possible effects of unionization. Although there is no transcript or recording of King's statements, the administrative law judge ("ALJ") and the NLRB credited the testimony of several employees who heard King's comments. DTR employee James Lehman ("Lehman") testified that King stated that the employees "had the right to choose whether we want[ed] third party representation or not but there was some facts he thought we needed to know." J.A. at 72 (Dec. 16, 2003, NLRB Hr'g Tr., Lehman Test. at 33:8-10).

3

Rita McVetta ("McVetta"), another DTR employee, testified on direct examination that King explained DTR's status as a sole-source supplier. According to McVetta, King stated "that if we got [a] Union into the plant that they wouldn't probably do business with us and we wouldn't have jobs." J.A. at 54 (Dec. 16, 2003, NLRB Hr'g Tr., McVetta Test. at 15:22-24). On cross examination, McVetta stated that King made it clear at the PA meeting that "[i]f we had a Union in there[,] customers would not want to deal with us because of the Union." J.A. at 63 (McVetta Test. at 24:13-14). On cross examination, Lehman corroborated McVetta's recollection of the PA meeting; according to Lehman, King stated "that if Honda or Toyota or any other customer became concerned about reliability of DTR's production flow, . . . those customers would look for other sources." J.A. at 76 (Lehman Test. at 37:6-8). Lehman's impression was that King wanted employees to know that unionization might threaten DTR's reliability, lead to a loss of business, and ultimately force job cuts.

Gahman also testified about King's comments at the PA meeting. On direct examination Gahman summarized King's statements:

> [King] explained to us that we had a sole supplier deal going with some of our customers where we were the only company that made particular parts for them, and said that if the UAW was to get into DTR that we would lose that sole supplier status be-, because the companies would no longer feel confident with us being their only supplier because the UAW would make us more unreliable.
> And so they would allow other companies, you know, to compete with us for some of the parts that we were making. And he stated that if that happened it would result in layoffs and DTR had never laid anyone off he said [], in the time that they'd been a company, but if the UAW came there that that policy would, would have to change.

J.A. at 225 (Gahman Test. at 185:3-15). On cross-examination, Gahman stated that King expressed his concern "about action the customers might take" should DTR become unionized. J.A. at 275 (Gahman Test. at 235:13-14).

Subsequent to these events, DTR terminated Gahman for submitting a false sample for a drug test. DTR conducts random drug tests of its employees, and company policy dictates that DTR terminate any employee who returns a fraudulent sample. In September 2002, Gahman was selected for drug testing; the first sample he provided was brown-colored and undersized, so it was discarded, and DTR requested that Gahman produce another. Gahman's second sample was a bright color and was not warm enough, but the lab sealed and kept the sample. DTR requested that Gahman provide a third sample before a witness at the hospital, and this sample tested positive for marijuana. The second sample was tested and the lab concluded that the sample was "not consistent with normal human urine." J.A. at 6 (NLRB Order at 6).

## B. Procedural Background

On the basis of these and other incidents, the union filed charges with the NLRB against DTR on September 30, 2002.[1] After a three-day trial, on April 9, 2004, the ALJ issued an opinion holding that DTR violated 29 U.S.C. § 158(a)(1) by creating the impression that its employees were under surveillance, threatening employees with discipline if they continued to support the union, and

---

[1]Among the other incidents that provoked the union's actions, DTR ordered Gahman to remove a hat emblazoned with the UAW logo, claiming the hat was offensive. The NLRB found this to be a violation of 29 U.S.C. § 158(a)(1), and DTR does not contest that finding on appeal.

threatening employees with layoffs if DTR unionized. The ALJ also concluded that DTR violated 29 U.S.C. § 158(a)(3) for improperly terminating Gahman.

The NLRB affirmed the ALJ's conclusion that DTR had violated 29 U.S.C. § 158(a)(1) by creating the impression that its employees were under surveillance, threatening employees with discipline if they continued to support the union, and threatening employees with layoffs if DTR unionized. In reaching this conclusion, the NLRB distinguished the previous DTR case, *DTR Industries, Inc. v. NLRB*, 39 F.3d 106 (6th Cir. 1994), and concluded that King's statements were not protected speech. However, the NLRB reversed the ALJ's finding that Gahman was wrongly discharged. Because Gahman's second urine sample was found to be fraudulent, the NLRB concluded that DTR's dismissal of Gahman was consistent with DTR's policies.

The NLRB issued its order on September 7, 2007, and DTR timely filed a petition for review. On October 12, 2007, the NLRB filed a cross-application for the enforcement of its order.

## II. ANALYSIS

### A. Standard of Review

Although the NLRB must have "more than a mere scintilla of evidence" supporting its decision, we review the NLRB's decision deferentially; "[t]his Court reviews the NLRB's factual determinations, and its application of the law to a particular set of facts, for substantial evidence." *ITT Auto. v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999). "[A]s long as the record as a whole contains substantial evidence supporting the NLRB's findings, this Court must sustain those findings even if we might have reached a different conclusion upon de novo review." *Id.* Substantial evidence

"means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

## B. King's Statements

The primary question on appeal is whether King's statements at the PA meetings were impermissibly coercive in violation of 29 U.S.C. § 158(a)(1) or whether the statements constituted protected speech under 29 U.S.C. § 158(c). Section 158(a)(1) makes it "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the" employees' rights to self-organization and collective bargaining. 29 U.S.C. § 158(a). Section 158(c) protects "[t]he expressing of any views, argument, or opinion, or the dissemination thereof," but only if the "expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The NLRB concluded that King's statements "threatened employees with job loss in violation of" § 158(a)(1), and we agree. JA. at 1 (NLRB Order at 1).

DTR asserts that King's statements were not threats but were instead simply objective predictions of what would happen should DTR employees succeed in unionizing. Although the Supreme Court has made it clear that § 158(c) protects objective predictions, the Court also has stressed that any such predictions must be carefully phrased lest they erode into unsubstantiated threats:

> Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, *the prediction must be carefully phrased on the basis of objective fact* to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management

7

decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) (citation omitted) (emphasis added). Section 158(c) was intended to allow free debate about unionization in the workplace, but it is not so permissive as to allow coercive, threatening speech. *Chamber of Commerce v. Brown*, ___ U.S. ___, 128 S. Ct. 2408, 2413-14 (2008).

Because of the unique relationship between employer, employee, and union, the scope of protected employer speech in the labor setting is limited: "Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c)." *Gissel Packing*, 395 U.S. at 617. As the Supreme Court has explained, in assessing the scope of permissible employer expression, "any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Id*. This balancing must "recogniz[e] that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent," as opposed to "the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk." *Id*. at 617-18. Therefore, while

8

certain statements may be innocuous in many settings, when made during an effort to unionize those same statements may take on another character entirely. "In reviewing Company statements made in the emotion of a union drive, the Board reasonably considers the effect of the remarks from the point of view of those whose livelihood may depend on them." *Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1299 (6th Cir. 1988). Statements threatening plant closure or layoffs are particularly suspect because "threats of plant closure are 'among the most flagrant' of unfair labor practices." *Id.* at 1301 (quoting *Gissel Packing*, 395 U.S. at 611 n.31).

Applying the *Gissel Packing* standard, we must consider whether King's statements, taken as a whole, were carefully phrased predictions on the basis of objective fact, or contained "a threat of retaliation based on misrepresentation and coercion." *Gissel Packing*, 395 U.S. at 618.[2] Although some of King's statements contained predictions of what DTR's customers would do if DTR unionized, these predictions were not "carefully phrased on the basis of objective fact." *Gissel Packing*, 395 U.S. at 618. Considered in context, and given King's explicit statements that DTR would have to change its no-layoff policy and that DTR employees would lose their jobs, the statements as a whole had a "reasonable tendency" to be "coercive in effect." *NLRB v. Pentre Elec.,*

---

[2]The dissent attempts to set up a false dichotomy, asserting that "[w]hen the employer's prediction concerns a consequence over which he has no control, that by definition cannot constitute a 'threat of reprisal.'" Dissenting Op. at 4. This ignores the complexities and nuances of the type of statements at issue in § 158(a)(1) cases. As contemplated by § 158(c), a statement may contain both predictive and coercive elements. For example, an employer may make a prediction that unionization will cause a customer to decrease its business while also threatening that the employer will choose to deal with that loss of business through layoffs. If the statement that layoffs, rather than alternative measures, will be employed is not "carefully phrased on the basis of objective fact," it may reasonably be viewed by employees as containing a threat of reprisal, losing the protections of § 158(c). *Gissel Packing*, 395 U.S. at 618.

9

*Inc.*, 998 F.2d 363, 369 (6th Cir. 1993) (quoting *Peabody Coal v. NLRB*, 725 F.2d 357, 363 (6th Cir. 1984)), *overruled on other grounds by Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996).

According to DTR, King's statements were objective predictions because we previously held that similar statements made by DTR's president were objective predictions not containing impermissible threats. In 1989, during a prior unionization push at DTR, company president Yuji Kobayashi ("Kobayashi") sent a four-page letter to employees explaining his views regarding the effects of unionization. His letter included the following statement:

> Our business would automatically be reduced if the union wins the election and our customers took away 50 percent of our sole source business. They could, of course, take it all away and sole source with some non-union company. They do not have to give any business to DTR.
> Furthermore, most labor contracts are for three year terms. The U.S. auto companies force their unionized suppliers to build a 90-day inventory of parts before any labor contract termination. If the supplier fails to do so, it usually loses its order. That means that unionized suppliers, such as our associate Norbalt, are required to work overtime before the end of every labor contract and then, if the contract is negotiated without a strike, employees are laid off while the inventory is used.
> Point 3 really comes down to this. Bringing a union would lose business for DTR . . . .

*DTR Indus., Inc.*, 311 NLRB 833, 833 (1993) (quoting letter from Kobayashi to DTR employees (Nov. 10, 1989)). The letter went on to conclude:

> Having a union will hurt our business and our chances for success. We will lose some or all of our sole source business and create the danger of losing the confidence of our customers. Let us show what DTR and its associates can do together as a team without the union. You have our attention and our commitment. We will listen and we will respond and we will have a mutual commitment to each other.

*DTR Indus.*, 39 F.3d at 109 (quoting letter from Kobayashi). Kobayashi's letter to DTR employees certainly bears some similarity to King's statements at the PA meetings.

When we previously considered the effect of Kobayashi's letter, we concluded that the letter was an objective prediction. We first observed that "there is a distinction between 'threats' motivated by union animus and 'predictions' about the probable economic consequences of unionization; the former clearly violates section 8(a)(1), while the latter may be protected by section 8(c)." *Id.* at 113 (footnote omitted) (quoting *Pentre Elec.*, 998 F.2d at 369). We then concluded:

> [T]he Kobayashi letter, taken in context, is an objective prediction of what the petitioner's customers would do in the event the union prevailed, and thus is protected speech. Kobayashi explained in the communication that companies that sole-sourced with the petitioner were likely to split their business in order to have an alternative supply source in the event of a strike. As *Pentre Electric* demonstrated, Kobayashi was entitled to make this statement based on his industry experience and his knowledge of the petitioner's customer base, at which point it was incumbent on the Board to prove its falsity.

*DTR Indus.*, 39 F.3d at 114. Although we determined that Kobayashi's letter was protected speech, that conclusion does not compel us to find that King's distinct statement is also protected.

Kobayashi and King, despite the vague similarities between what they said, did not make identical statements, and their statements were made in different contexts. Although both Kobayashi and King explained the nature of DTR's sole-source-supply business and expressed the view that DTR's customers might not be happy with a unionized DTR, the similarities end there. Not once did Kobayashi's letter state that layoffs or plant closures were an inevitable outcome of unionization.[3] Explaining the importance of sole-source customers to DTR's business, Kobayashi

---

[3]The record before us does not contain the entirety of Kobayashi's letter. However, when the NLRB considered the effect of the letter, it concluded that the letter *was* threatening and coercive, *DTR Industries*, 311 NLRB at 833; thus, presumably the NLRB would have quoted the most damning sections of the letter. To the extent that we rely upon Kobayashi's letter in making our decision, we rely upon the language that the NLRB used in determining that the letter was

11

made the tautological point that "[o]ur business would automatically be reduced if the union wins

the election *and* our customers took away 50 percent of our sole source business." *DTR Indus.*, 311

NLRB at 833 (emphasis added). It is notable that Kobayashi did not follow this by saying that

layoffs would ensue. Even if layoffs were the eventual byproduct of unionization, Kobayashi's letter

was predicated upon the necessary condition of customers taking away 50 percent of the sole-source

business, something that Kobayashi did not guarantee. When discussing how automakers have

required unionized suppliers such as Norbalt to build up supply prior to the end of labor contracts,

Kobayashi stated that *other* companies have typically laid off employees while the excess supply was

depleted. However, this was a factual statement and not a threat; as the dissent acknowledges, this

experience would lead to layoffs only "if other companies' experience was any guide." Dissenting

Op. at 8. Kobayashi did not go so far as to say that DTR would lay off employees. In fact,

Kobayashi closed his letter by expressing his desire for "DTR and its associates" to work "together

as a team" and describing the "mutual commitment to each other." *DTR Indus.*, 39 F.3d at 109

(quoting letter from Kobayashi).

Kobayashi's letter, by not promising layoffs at DTR, is different than King's statements to

employees at the PA meetings. McVetta, Lehman, and Gahman all agreed that the import of King's

statement was that unionization would lead to job layoffs. Contrary to the dissent's assertion that

King "did not *guarantee* that layoffs would result from unionization," Dissenting Op. at 9, King

specifically stated that increased competition "would result in layoffs" and that, "if the UAW came

---

coercive and threatening.

there [DTR's no-layoff] policy would, would have to change," J.A. at 225 (Gahman Test. at 185:12-15). McVetta also recalled King's statement "that if we got [a] Union into the plant that they wouldn't probably do business with us and we wouldn't have jobs." J.A. at 54 (McVetta Test. at 15:22-24). Thus, the tenor of King's statements was different than Kobayashi's. Unlike Kobayashi, King explicitly stated that a decrease in business as a result of unionization would be dealt with through layoffs at DTR.[4]

In addition to the fact that King explicitly raised the spectre of DTR layoffs while Kobayashi did not, another key distinguishing feature is the context of these statements. First, Kobayashi was president of DTR, while King was an Executive Coordinator, DTR's chief human-resources officer. Although Executive Coordinator may in fact be an important position at DTR, the NLRB distinguished King and Kobayashi by noting that Kobayashi's privileged position at the company gave him "industry experience and knowledge of [DTR's] customer base," while King's statement lacked such context. J.A. at 2 (NLRB Order at 2). In other words, King's tenure at DTR says nothing to employees about his ability to know whether layoffs would be an economic necessity. As one NLRB Chairman noted, "there are ways, other than layoffs, to deal with drop-offs of business," J.A. at 2 (NLRB Order at 2 n.14), but the record does not suggest that King was in a position to assess the viability of alternative measures. As chief human-resources officer, King's statements could reasonably have been viewed by employees as indicating that DTR would deal with

---

[4]The dissent cites the employees' agreement with statements by DTR's trial counsel that King was discussing customer reaction to a union win. Dissenting Op. at 6. While King may have made some such objective statements, this does not overcome King's explicit statements that DTR would choose to deal with unionization through layoffs.

a decline in business through layoffs or other labor-related options, increasing the threatening quality of the statements. Although King may have known about Kobayashi's prior statements and the ensuing NLRB litigation, there is no indication that any of this knowledge was expressed to the employees. As the Supreme Court has stated, "the Board could reasonably conclude that the intended and understood import of that message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work *regardless of the economic realities*." *Gissel Packing*, 395 U.S. at 619 (emphasis added). If the person making the statements threatening layoffs is not seen as in a position to know the economic realities of the company, then the threat is made regardless of the company's economic realities. While it is true, as the dissent observes, that we found statements of lower-level supervisors to be protected in the earlier DTR case, we emphasized that these statements "merely repeated the observations made in Kobayashi's letter," *DTR Indus.*, 39 F.3d at 114, and therefore were taken in the context of the objective facts and predictions already provided by DTR's president.

While Kobayashi no doubt knew the economic condition at DTR, King's statement was made "without objective facts for actually believing[] that plants might close if employees voted in the union." *ITT Auto.*, 188 F.3d at 386. "In the present case, no objective evidence was presented by the Company supporting a statement that unionization would result or even could result in an objectively required economic closing of the plant. Indeed, the Company failed before both the ALJ and the Board to support such a statement as based in fact." *Indiana Cal-Pro*, 863 F.2d at 1298-99 (holding that the NLRB possessed substantial evidence supporting the conclusion that a supervisor violated § 158(a)(1) when he told employees that he heard from ownership that unionization would

14

lead to the owners shutting down the plant). Further, King provided no objective facts to explain why layoffs, rather than alternative measures, would be a necessary consequence of a decrease in business. Without this objective support, employees could reasonably view this choice as a threat of reprisal. Combined with King's lower position at DTR, his failure to provide objective facts to support his statements leads to the conclusion that "their . . . reasonable tendency is coercive in effect." *Pentre Elec.*, 998 F.2d at 369 (alteration in original) (quoting *Peabody Coal*, 725 F.2d at 363).[5]

In addition to asserting that our prior holding in the earlier DTR case protects King's statements, DTR encourages us to apply *Pentre Electric* to conclude that King's statement was not impermissibly coercive. We hold that *Pentre Electric* is inapposite. In that case we approvingly cited the following summary of the law: "While coercive speech and conduct by an employer are prohibited by the NLRA, the expression of noncoercive views, arguments, and opinions for and against unionization cannot be held unlawful." Rebecca Hanner White, *The Statutory and Constitutional Limits of Using Protected Speech as Evidence of Unlawful Motive Under the National Labor Relations Act*, 53 Ohio St. L.J. 1, 3 (1992) (footnote omitted), *quoted in NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir. 1993). Although it is true that noncoercive arguments are not unlawful, in *Pentre Electric* we held merely that there was no violation of § 158(a)(1) because "[t]he record is simply devoid of any evidence that [the supervisors] suggested that Pentre might

---

[5]The requirement of objective support does not mean that employers must provide empirical evidence: Although "an employer is not required to 'produce evidence to corroborate predictions about the effect of unionization,'" our decisions "still require[] an employer's statements to have the support of precise objective facts." *ITT Auto.*, 188 F.3d at 386 n.8.

close its doors, much less that they would close Pentre as a means to punish the employees if they voted in favor of the union." *Pentre Elec.*, 998 F.2d at 370. Thus, contrary to the dissent's assertions, *Pentre Electric* is factually very different than the case at hand; King did threaten layoffs, and we believe that the Board's decision that his statements were coercive is supported by substantial evidence.

We recognize that this case is not easy given the similarities between King's statements and Kobayashi's letter. In reaching our conclusion, however, we bear in mind our deferential standard of review and the Supreme Court's admonition that "a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel Packing*, 395 U.S. at 620. DTR has not challenged the NLRB's conclusion that DTR did commit some violations; thus, it is clear that the DTR unionization effort led to a tense atmosphere. Given that atmosphere, King's statements were not carefully phrased to avoid implied threats of reprisal. For these reasons, we uphold the NLRB's conclusion that King's statements were coercive and threatening in violation of 29 U.S.C. § 158(a)(1).

## C. Gahman's Credibility

The second issue on appeal is whether the NLRB erred in concluding that DTR threatened to punish Gahman for his union activities and gave Gahman the impression that he was under surveillance. DTR argues that the NLRB erred because it based its decision solely on Gahman's testimony—the uncorroborated, biased testimony of a discredited employee. We conclude that the NLRB had substantial evidence in support of its decision. "[T]his Court generally defers to the credibility determinations of the NLRB, particularly where the 'record is fraught with conflicting

testimony and essential credibility determinations have been made.'" *ITT Auto.*, 188 F.3d at 384

(quoting *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir.1987)).

The ALJ did not rely solely upon Gahman's testimony in determining that DTR threatened Gahman with punishment for his union activities and gave Gahman the impression that his activities were under surveillance. The ALJ believed that Gahman's testimony was corroborated by King's own notes from the meeting with Gahman. According to the ALJ's decision, King's notes show that the meeting "was about Gahman's union activity . . . creating the impression of surveillance." J.A. at 27 (ALJ Dec. at 27). Furthermore, the ALJ observed that there were other supervisors at the meeting between Gahman and King, yet "[n]one of these other supervisors were called by [DTR] to corroborate King's testimony." *Id.* Thus, there was substantial evidence supporting the ALJ and NLRB's conclusion.

The fact that Gahman was separately found to have submitted a fraudulent drug sample does not mean that the ALJ and NLRB cannot find him credible as to other issues. The ALJ has the ability to credit parts of a witness's testimony, even when discrediting other parts of the testimony. *Carrier Corp. v. NLRB*, 768 F.2d 778, 782 (6th Cir. 1985). Given our level of deference for ALJ and NLRB credibility determinations, we conclude that there was substantial evidence supporting the ALJ and NLRB's conclusion that DTR threatened to punish Gahman for his union activities and gave Gahman the impression that he was under surveillance.

## III. CONCLUSION

In the sensitive labor relations setting, employers' predictions of plant closures and job losses are readily perceived as coercive and threatening by employees, who are dependent on the employer

17

for their livelihood. *See Gissel Packing*, 395 U.S. at 617. Given the strong interest in protecting the rights of employees to associate freely, it is therefore not enough for an employer simply to preface a threat of layoffs with a prediction about customer response to unionization: Any "prediction must be carefully phrased on the basis of objective fact." *Id*. at 618. Without such objective context, it is all too easy for vulnerable employees to perceive their employer as intending to punish union supporters by laying them off if business drops. The law does not require much of an employer, who, as the party in control of the employer-employee relationship, is in the best position to "avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees." *Id*. at 620. Requiring any less would allow employers to consistently circumvent the prohibitions of § 158(a)(1) by simply assuring that their threats are accompanied by vague predictions of the effect of unionization on the firm's business.

For these reasons, we believe that there was substantial evidence supporting the NLRB's conclusions that King's statements violated 29 U.S.C. § 158(a)(1) and that DTR threatened to punish Gahman for his union activities and gave Gahman the impression that he was under surveillance. Therefore, we **DENY** the petition for review, and we **ENFORCE** the NLRB's order.

Nos. 07-2139/2324
*DTR Industries, Inc. v. NLRB*

SUTTON, J., concurring in part and dissenting in part. I agree with the majority that Thomas King's remarks to Daniel Gahman amounted to an unfair labor practice. But I respectfully disagree with its conclusion that King's speeches at the pre-election employee meetings did not constitute protected employer speech under § 8(c) of the NLRA, 29 U.S.C. § 158(c).

Section 8(a)(1) of the NLRA bars employers from taking actions that "interfere with, restrain, or coerce employees in the exercise of" an employee's right to organize and participate in union representation. 29 U.S.C. § 158(a)(1). In the statute's early years, the Board interpreted § 8(a)(1) expansively, "condemn[ing] almost any anti-union expression by an employer." *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1138 (D.C. Cir. 1994) (internal quotation marks omitted). Concerned that the Board's "aggressive enforcement of § 8(a)(1) had made it excessively difficult for employers to engage in any form of non-coercive communications with employees regarding the merits of unionization," *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1361 (D.C. Cir. 1997), and concerned about the infringement of the employer's free-speech rights, *cf. Hecla Mining Co. v. NLRB*, 564 F.2d 309, 313 & n.6 (9th Cir. 1977), Congress in 1947 added a new provision to limit § 8's scope—§ 8(c), Labor-Management Relations Act, ch. 120, sec. 101, § 8(c), 61 Stat. 136, 142 (1947) (codified at 29 U.S.C. § 158(c)). Under the new provision, "[t]he expressing of any views, argument, or opinion shall not constitute or be evidence of an unfair labor practice . . . if it contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

Section 8(c) not only levels the field between advocacy for union organization and advocacy against it, but the provision also "implements the First Amendment." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969); *see also United Food & Commercial Workers Union Local 204 v. NLRB*,

19

506 F.3d 1078, 1081 (D.C. Cir. 2007). Both objectives further the end of making "[c]ollective bargaining . . . work" by allowing "labor and management . . . to exercise their right to engage in uninhibited, robust, and wide-open debate," *Steam Press Holdings, Inc. v. Hawaii Teamsters*, 302 F.3d 998, 1009 (9th Cir. 2002) (internal quotation marks omitted); *see also Healthcare Ass'n of N.Y. State, Inc.v. Pataki*, 471 F.3d 87, 98–99 (2d Cir. 2006), and by encouraging "freewheeling use of the written and spoken word," *Chamber of Commerce v. Brown*, __ U.S. __, 128 S. Ct. 2408, 2413–14 (2008).

By ensuring that unionization campaigns involve a neutral dialogue rather than a one-sided monologue, § 8(c) "serves a labor law function of allowing employers to present an alternative view and information that a union would not present." *Healthcare Ass'n*, 471 F.3d at 98. Opening lines of communication "aids the workers by allowing them to make informed decisions" based not only on the union's own assertions but also on "a reasoned critique of their unions' performance." *Id.* at 99 (internal quotation marks omitted). And uninhibited discourse levels the playing field for the employer, whose "only effective way of arguing against the union is . . . to point out to the workers the adverse consequences of unionization." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 369 (6th Cir. 1993) (internal quotation marks omitted), *abrogated on other grounds by Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996); *cf. Boaz Spinning Co. v. NLRB*, 439 F.2d 876, 878 (6th Cir. 1971). Consistent with the free-speech principles underlying § 8(c), we have applied this rule in favor of speech by management, *see Pentre*, 998 F.2d at 368–71, and in favor of speech by a union president, *see NLRB v. Constr. & Gen. Laborers' Union Local No. 534*, 778 F.2d 284, 290–91 (6th Cir. 1985) (reversing Board's decision that a union president's speech amounted to an unfair labor practice and

20

holding it was protected where the president "did not explicitly threaten that [the union] would take some action against persons who file unfair labor practice charges" but instead "the action threatened was action that would have been taken by an independent third party with no instigation or assistance from the Union," his statements did not contain "some implied threat that the Union or its members would take some action against persons who file charges" and the Board did not find his statements were "false").

Section 8(c) thus confirms that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union." *Gissel*, 395 U.S. at 618. And an employer "may even make a prediction as to the precise effects he believes unionization will have on his company" if it is "carefully phrased on the basis of objective fact" and is designed "to convey an employer's belief as to demonstrably probable consequences *beyond his control*." *Id.* (emphasis added).

Threats of reprisal by an employer, by contrast, serve none of these objectives and indeed add nothing of value to the dialogue Congress sought to foster. That is why § 8(c) offers no safe harbor to statements that "could easily and understandably be perceived as veiled threats of retaliation," and an employer "cannot obtain the protection of section 8(c) simply by labeling [such] statements 'opinion.'" *Peabody Coal v. NLRB*, 725 F.2d 357, 363 (6th Cir. 1984); *see also NLRB v. Price's Pic-Pac Supermarkets*, *Inc.*, 707 F.2d 236, 240 (6th Cir. 1983).

But that does not mean every employer's prediction of hard times (and potentially lost work for employees) flowing from unionization amounts to an impermissible threat of reprisal or retaliation. There is a difference between a prediction that unionization will hurt the company's

business and a threat to retaliate against employees if they unionize. When the employer's prediction concerns a consequence over which he has no control, that by definition cannot constitute a "threat of reprisal," namely a threat of retaliation. "[E]mployees may not reasonably conclude that they are being coerced where the [employer's] opinions refer to matters over which the speaker has no control." *Pentre*, 998 F.2d at 369. What divides protected predictions from prohibited threats of reprisal, then, is whether the employer's speech contains an "implication that [the] employer may or may not take action *solely on his own initiative* for reasons unrelated to economic necessities and known only to him." *Gissel*, 395 U.S. at 618 (emphasis added); *see also id.* at 619. Only a statement that "conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus" falls outside § 8(c)'s protective scope. *Pentre*, 998 F.2d at 371. As Judge Friendly and "the dictionaries tell us, a 'threat of reprisal' means a 'threat of retaliation' and this in turn means not a prediction that adverse consequences will develop but a threat that they will be deliberately inflicted in return for an injury—'to return evil for evil.'" *NLRB v. Golub Corp.*, 388 F.2d 921, 928 (2d Cir. 1967). The burden rests on the *Board* to prove that § 8(c) does not protect a particular statement, *not* on the employer to prove the opposite. *See Pentre*, 998 F.2d at 371.

Our cases consistently have stood by this rule. On the one side of the line, where an employer tells employees that the company will terminate them if they unionize, the statement receives no protection. *See, e.g.*, *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 660 (6th Cir. 2005); *Ind. Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1298–99 (6th Cir. 1988). On the other side of the line, where an employer expresses his view that unionizing a company or plant will lead to

consequences beyond the employer's control—such as current or prospective customers' likely responses to dealing with a unionized supplier—his statements fall within § 8(c)'s safe harbor.

*Pentre* sharpens the distinction. Company officials gave speeches to the effect that unionization would severely undercut the company's customer base. *See id.* at 369–70. Although the company's leaders never promised plant closure or layoffs, they said that they were "'not prepared' to endure the hardships of rebuilding a customer base," strongly suggesting that the workers' tenure would be short-lived if the union won. *Id.* *Pentre* held that the statements still received protection because the speakers never said the company would *retaliate* for employees' exercise of their statutory rights. "Not a shred of evidence indicates that [the speakers] predicted these consequences based on matters within [their] own volition or control," and the "record [was] simply devoid of any evidence that [the speakers] suggested . . . they would close [the company] as a means to punish employees if they voted in favor of the union." *Id.* at 370. "No employee," as a result, "could reasonably have come away from [the employers' speeches] with the belief that anti-union sentiment on the part of the company could lead to closure if the employees voted in favor of the union." *Id.*; *see also NLRB v. Vemco*, 989 F.2d 1468, 1489 (6th Cir. 1993) (holding that an employer's statement that unionization would result in a work shortage resulting in reduced hours or layoffs was a permissible, objective prediction, and thus protected speech under § 8(c), where nothing suggested that the expected work shortage "was within [the employer's] control" or that the employer "would implement a cutback in hours or a layoff solely on its own initiative for reasons unrelated to the economic necessity of adjusting to a shortage of work"); *accord Be-Lo Stores v. NLRB*, 126 F.3d 268, 285–86 (4th Cir. 1997); *Gen. Elec. Co. v. NLRB*, 117 F.3d 627, 633 (D.C. Cir.

1997); *NLRB v. Vill. IX*, 723 F.2d 1360, 1368–69 (7th Cir. 1983); *Patsy Bee, Inc. v. NLRB*, 654 F.2d 515, 518 (8th Cir. 1981); *cf. Crown Cork*, 36 F.3d at 1138–39, 1144–46 (collecting cases and cataloguing statements that federal courts have held protected by § 8(c)).

This principle, it seems to me, should make short work of this case. As recounted by the employees whose testimony the ALJ credited, King told the employees at the meetings that it was their own choice whether to unionize, explained the company's sole-source relationships and just-in-time manufacturing model, expressed his "expectation" that if DTR became unionized, the company's sole-source, just-in-time customers would seek other suppliers to prevent production-flow interruptions in the event of a strike, JA 275, and predicted that this would result in less work to go around at DTR and thus lead to layoffs, *see* JA 76–77 (employee agreeing that King's message was that "customers would have to evaluate whether to keep DTR as the sole source supplier" based on reliability concerns, and "if the customers pulled some business away from DTR because of this fear of reliability, that would mean there would be less work and fewer jobs at DTR"); JA 275 (employee agreeing that "the concern [King] expressed was about actions the customers might take" and "when . . . [King] mentioned layoffs, the layoffs would be because customers pulled part or all of their business out of DTR and there wasn't enough work to go around").

Nothing in King's remarks amounted to a "threat of reprisal," as this court and other courts have construed the phrase. The whole point of his statements was that other factors—the decisions of clients—would cause a slowdown in business and eventually job layoffs, not that the company vindictively planned to lay off workers, whether business slowed down after unionization or not. The predicted economic consequences—a severe reduction in the company's business leading in turn

24

to layoffs—simply did not encompass anything within DTR's control. *Cf. Vemco*, 989 F.2d at 1489.

That a company may be forced by a loss of business to lay off workers does not make its action a

voluntary one in the sense that *Gissel* described. *See Crown Cork*, 36 F.3d at 1137 ("The fact that

an identifiable manager, and not an invisible hand, makes these decisions (subject to sanction by the

market if he or she makes them incompetently), does not mean that they are any less 'economic

necessities' or 'beyond his control' in the sense those phrases are used by *Gissel*.").

But even if there were uncertainty about the guidance these cases offer, our application of

these principles to the same employer, the same union and strikingly similar statements ought to

suffice to resolve this case. Fourteen years ago, we decided *DTR Industries, Inc. v. NLRB* (*DTR I*),

39 F.3d 106 (6th Cir. 1994), which involved an attempt by the same union, the UAW, to unionize

the same DTR plant, *see id.* at 109. A week before the election, the company's then-president, Yuji

Kobayashi, sent a letter to the plant's employees arguing that because the company's success

depended heavily on its sole-source relationships with just-in-time manufacturers, unionization

would seriously harm its business, possibly requiring layoffs. *Id.* Kobayashi told the employees that

DTR's "business would automatically be reduced if the union wins the election and our customers

took away 50 percent of our sole source business." *Id.* (internal quotation marks omitted). Those

customers, he added, who did not turn to other suppliers would likely require DTR to produce and

maintain a 90-day inventory when each collective-bargaining agreement approached its

expiration—an experience that, if other companies' experience was any guide, would lead to layoffs.

*See id.*

The union alleged, and the Board found, that Kobayashi's letter and the other supervisors' statements amounted to unlawful threats of reprisal and thus constituted an unfair labor practice. *Id.* at 110. We disagreed. "Kobayashi['s] letter," we explained, "taken in context, is an objective prediction of what the petitioner's customers would do in the event the union prevailed, and thus is protected speech." *Id.* at 114. The letter set forth the basis for Kobayashi's prediction, explaining the company's sole-source business and the reasons customers would diversify their portfolios of suppliers, and we noted that Kobayashi "was entitled to make this statement based on his industry experience and his knowledge of [DTR's] customer base." *Id.* The Board offered nothing to show that Kobayashi's statements were either untruthful or "subjective" as we defined that term in *Pentre*, *see id.*—i.e., that the statement "conveys that the employer will act on its own initiative to punish employees as the result of anti-union animus," *Pentre*, 998 F.2d at 371.

Our decision in *DTR I* fully answers the questions raised by this case. King, like Kobayashi, explained the nature of the company's sole-source business, his expectations that unionization would lead the company's customers to redirect business to other suppliers and his view that this would lead to layoffs. *Cf.* 39 F.3d at 109; *DTR Industries, Inc.*, 311 N.L.R.B. 833, 833 (1993) (reprinting portions of Kobayashi's letter). Just as we held Kobayashi's statements entitled to § 8(c)'s protection, so too we should hold King's statements entitled to protection.

In reaching the opposite conclusion, the majority attempts to distinguish King's and Kobayashi's statements. The language of Kobayashi's letter, it says, "did not guarantee" that DTR's customers would "tak[e] away 50 percent of the sole-source business." Maj. Op. at 12. But of course Kobayashi did not guarantee that unionization would cause the company to lose a specific

26

percentage of business. How could he do that, or for that matter how could anyone do that? What matters is that he plainly promised that unionization would decrease DTR's business. "Bringing a union," he said, "would lose business for DTR." *DTR Indus.*, 311 N.L.R.B. at 833. "Having a union," he added, "will hurt our business and our chances for success. We will lose some or all of our sole source business . . . ." *DTR I*, 39 F.3d at 109. The 50% loss was one way of estimating what would happen and one way of illustrating why jobs would be lost. Kobayashi, indeed, was hardly fixated on a 50% estimate, as he raised more ominous possibilities later, saying that DTR's customers might "take [the company's business] *all* away and sole source with some non-union company." *DTR Indus.*, 311 N.L.R.B. at 833. Viewed from the perspective of employees prone "to pick up intended implications . . . that might be more readily dismissed by a more disinterested ear," *Gissel*, 395 U.S. at 617, his words left no doubt that unionization would cause the company to lose a substantial amount of, if not all of, its sole-source business.

In a similar vein, the majority insists that Kobayashi, unlike King, never "explicitly raised the spectre of DTR layoffs." Maj. Op. at 13. Yet Kobayashi's letter explicitly *did* mention layoffs. *See DTR Indus.*, 311 N.L.R.B. at 833. To be sure, he did not *guarantee* that layoffs would result from unionization, but neither did King; they both made predictions about the effect unionization would have on business and, in turn, jobs. The key point is this: *Gissel* tells us to stand in the employees' shoes when gauging the effect of Kobayashi's and King's words, and both permitted an employee to infer that unionization would cause a drop-off in business, which would lead to layoffs.

Beyond the words King and Kobayashi used, the majority argues that differences in the contexts of their statements sets them apart. *See* Maj. Op. at 13–14. Context no doubt can be crucial

to understanding the meaning that an employer's statement carries. *See Ind. Cal-Pro*, 863 F.2d at 1299. But as the Board bears the burden of proving a statement unprotected by § 8(c), *Pentre*, 998 at 371, it must demonstrate why the context of King's statements made them threats of reprisal while Kobayashi's letter (and other supervisor's statements) in a nearly identical scenario did not. In trying to meet this burden, the Board noted that Kobayashi's "letter explained that [his] perspective was based upon his industry experience and knowledge of [DTR's] customer base," while King's speeches did not. JA 2. But that purported distinction misreads our decision in *DTR I*: While *we* pointed out that Kobayashi's experience and knowledge "entitled" him to make the statements in his letter, we never mentioned (much less rested our decision upon) the letter's recitation of his qualifications. *See DTR I*, 39 F.3d at 114. And although we defer to the Board's interpretations of the statutes it administers, we do not give it the benefit of the doubt in interpreting *our* precedents. *See Albertson's, Inc. v. NLRB*, 301 F.3d 441, 448 (6th Cir. 2002).

But, the majority adds, Kobayashi was the company president when he wrote his letter, Maj. Op. at 13, while King served as the company's chief human-resources officer. Thus, it continues, while Kobayashi "no doubt knew the economic condition at DTR," *id.* at 15, as his "privileged position at the company gave him industry experience and knowledge of [DTR's] customer base," *id.* at 13 (internal quotation marks omitted), there is no reason to believe that King had any similar knowledge, and thus his "statement was made without objective facts for actually believing that plants might close if employees voted in the union," *id.* at 15 (internal quotation marks and alteration omitted). Yet § 8(c) protects "the expressing of any views, argument, or opinion," 29 U.S.C. § 158(c), and we have never suggested that these words require employers to exercise their freedom

of speech only through pre-vetted economic experts or that § 8(c)'s protection otherwise depends on the status of the speaker. To the contrary, we held in *DTR I* that § 8(c) protected the statements of *three low-level supervisors* who told employees that unionization would lead to a drastic loss of business from two of the company's three largest sole-source customers. *See* 39 F.3d at 109, 114–15.

Even though King was not the president of the company, I fail to understand why he lacked a sufficient basis to make his observations for an independent reason. He attended Kobayashi's presentations during the 1989 union campaign, which may explain why he spoke this time around. He observed the ensuing proceedings that culminated in *DTR I.* And he had served as the company's top human-resources officer for over a decade. Far from being in the dark about the labor-related options at DTR's disposal "to deal with drop-offs in business," King would have been in an ideal position to understand and "assess the viability of alternative measures" to layoffs. Maj. Op. at 14 (internal quotation marks omitted).

In condemning King's statements because he presented "no objective evidence . . . supporting [his] statement that unionization would result or even could result in an objectively required economic closing of the plant," *id.* at 15 (internal quotation marks omitted), the majority asks more of DTR than our cases—including *DTR I*—demand. Just as King did not accompany his remarks with empirical evidence supporting his personal views and predictions, neither did Kobayashi. To construe § 8(c) as imposing on employers the burden of proving objectively the truth of every assertion they make would contravene both the language of the statute—which encompasses "any views, argument, or opinion," 29 U.S.C. § 158(c)—and its purpose, *see Pentre*, 998 F.2d at 371

("Requiring an employer to present, in advance and without a request from the Board, evidence to corroborate its predictions would, in our mind, defeat the integral purpose of section 8(c)."). If, as the Supreme Court has said, the purpose of the statute is to foster "uninhibited, robust, and wide-open debate in labor disputes" through "freewheeling use of the written and spoken word," *Chamber of Commerce*, 128 S. Ct. at 2414 (internal quotation marks omitted), I am hard-pressed to understand how this objective-evidence requirement is consistent with that goal.

At the end of the day, Kobayashi's and King's statements must stand or fall together. Either both crossed the line from protected speech to prohibited threats of reprisal, or both stayed within § 8(c)'s shield. Absent a meaningful distinction between the two statements, the answer to the two cases must be the same. Neither the statements of Kobayashi, nor of his underlings nor of King amounted to "threats of reprisal," and accordingly *DTR II* should come out the same way as *DTR I*. *Pentre*, 998 F.2d at 371.

What ultimately separates us in this case is the meaning of threats of "reprisal." As I read *Gissel*, *Pentre* and *DTR I*, they define the term just the way the dictionaries do—as requiring a threat to *punish* employees or to *retaliate* against them for voting for unionization, something that simply is not covered when the employer warns that unionization will cause a drop off in business and will lead to layoffs. When an employer threatens punishment or retaliation if employees vote for unionization, by contrast, he communicates that layoffs will result no matter what happens to the business—that layoffs will follow in spite of, not because of, potential declines in business. All of this, the majority says, is a "false dichotomy." Maj. Op. at 9 n.2. But why that is so is never explained, much less supported by the case law. Consistent with the case law and the plain meaning

of "reprisal," the dichotomy is the fulcrum upon which the case turns and which the statute's text and controlling precedent put front-and-center: What matters is whether King's statements conveyed a promise or even the possibility that DTR would "punish" its employees for unionizing—by laying off workers irrespective of, or beyond the extent of, the uncontrollable impact unionization would have on DTR's business. *Cf. Gissel*, 395 U.S. at 618 (holding statements unprotected "[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him"); *Pentre*, 998 F.2d at 369, 371 (explaining that a "statement is an unlawful threat" if it "is subjectively phrased in that it conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus"). King's words, like Kobayashi's words before him, did no such thing, and the employees in attendance did not suggest otherwise. Whatever else can be said about King's remarks, they cannot be characterized as "threat[s] of reprisal," 29 U.S.C. § 158(c); *Gissel* 395 U.S. at 618. The majority seeing these issues differently, I respectfully dissent.